**UNITED STATES of America, Plaintiff,**

v.

**Thomas BURNSIDE, et al., Defendants.**

**No. 89 CR 909.**

United States District Court,
N.D. Illinois, E.D.

June 4, 1993.

---

**1219**

John A. Smietanka, Acting U.S. Atty., Barry Rand Elden, Asst. U.S. Atty., Chicago, IL, for U.S.

Donald V. Young, Donald V. Young & Assoc., P.C., Chicago, IL, for Thomas Burnside.

Richard S. Kling, Clinical Professor, Chicago Kent School of Law, Chicago, IL, for Codell Griffin.

Brian M. Collins, Chicago, IL, for C.D. Jackson.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge.

This multi-defendant criminal case is among several filed in this federal district during the period 1986 through 1989[1] in which persons alleged to have been associated with the Chicago street gang known as the "El Rukns" were charged.[2] Each of these cases stemmed from a multi-year, multi-jurisdictional criminal investigation of the El Rukn street gang. Among the law enforcement personnel who worked as part of the joint "El Rukn" task force were prosecuting attorneys, law enforcement agents and police officers from local, state and federal governmental entities. These law enforcement personnel utilized numerous investigatory tools, including court-authorized wiretaps on several phones over extended periods of time. Several high-ranking members in the El Rukn gang cooperated with the government and testified for the government at the trials of the "El Rukn" cases.

The three defendants whose post-trial motions are before the court, Thomas Burnside, Codell Griffin and C.D. Jackson, were not alleged to be El Rukn gang members, but were alleged to have supplied illegal drugs to the El Rukns. At the five-week jury trial of

---

1. *See, e.g., United States v. Jeff Fort, et al.,* 86 CR 572 (N.D.Ill.) (Norgle, J.), *aff'd, United States v. McAnderson,* 914 F.2d 934 (7th Cir.1990); *United States v. Victor Johnson, et al.,* 88 CR 555 (N.D.Ill.) (Leinenweber, J.), *aff'd,* 903 F.2d 1084 (7th Cir.1990).

2. The Seventh Circuit in *United States v. McAnderson,* 914 F.2d 934, 939 (7th Cir.1990) described the El Rukns as follows:

The El Rukns are a Chicago street gang with slightly over 100 members. The gang began in the 1960's as the Blackstone Rangers. In the 1970's, they were known as the Black P Stone Nation. In the 1980's, Jeff Fort became the

undisputed leader of the gang and the organization was renamed the El Rukns, meaning "cornerstone." The El Rukns, under Fort, became a carefully structured enterprise. Fort, the "Imam", sat at the top of the hierarchy. Beneath him in descending rank were "generals," "Officer Muftis," "ambassadors," and "soldiers" or "Els." Under Fort's leadership, the El Rukns also embraced the Muslim faith. Their headquarters at 3947 South Drexel was known as the "Mosque," and occasional religious services, educational classes and social gatherings were held there.

these three defendants, four high-ranking El Rukn gang members, Henry Harris, Harry Evans, Earl Hawkins and Ervin Lee, testified for the government pursuant to plea agreements. All three defendants were found guilty. In their post-trial motions, the defendants contend that their convictions should be overturned because of prosecutorial misconduct by government personnel relating to the government's cooperating witnesses in the "El Rukn" cases.

For the reasons stated in this opinion, the motions of defendants Burnside, Griffin and Jackson for a new trial are granted.

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| PROCEDURAL HISTORY OF THE CASE | | 1222 |
| FACTUAL FINDINGS AS TO POST–TRIAL EVIDENCE | | 1224 |
| I. | The Government's Cooperating "El Rukn" Witnesses | 1225 |
| II. | The Government's Witnesses' Illegal Drug Use | 1225 |
| | A. Positive Drug Test Results | 1225 |
| | B. Eyewitnesses to the Illegal Drug Use | 1226 |
| | 1. Nicholas Ahrens | 1226 |
| | 2. Raymond Bonnema | 1227 |
| | 3. "John Doe" | 1227 |
| | 4. Jackie Clay | 1229 |
| | 5. Harry Martin | 1229 |
| | 6. Evaluation of Eyewitnesses' Credibility | 1230 |
| | C. Admissions of Illegal Drug Use | 1230 |
| | 1. Henry Harris' Admissions of Illegal Drug Use: | 1230 |
| | (a) at 1989 Disciplinary Hearing | 1230 |
| | (b) to Ervin Lee | 1231 |
| | (c) to Tanya Van Blake | 1231 |
| | (d) to Mustag Malik | 1231 |
| | (e) to Harry Martin | 1231 |
| | 2. Harry Evans' Admissions of Illegal Drug Use: | 1231 |
| | (a) to Nicholas Ahrens | 1231 |
| | (b) to "John Doe" | 1232 |
| | (c) overheard by Lenell Smith | 1232 |
| | (d) to Harry Martin | 1232 |
| | (e) in Monitored 1992 Phone Conversation | 1232 |
| | D. Circumstantial Evidence of Illegal Drug Use | 1232 |
| | 1. Evans Appeared to be Using Illegal Drugs | 1232 |
| | 2. Henry Harris' Refusal to Take Drug Test | 1233 |
| III. | The Government's Awareness of its "El Rukn" Witnesses' Illegal Drug Use | 1233 |
| | A. MCC's Warden Told U.S. Attorney Personnel of Illegal Drug Use | 1234 |
| | B. MCC's Warden Provided a Memorandum to the U.S. Attorney's Office Showing Positive Drug Test Results | 1234 |
| | C. AUSA Rosenthal Spoke with AUSA Hogan About the Positive Drug Test Results | 1234 |
| | D. Witnesses told AUSA Hogan of the Illegal Drug Use | 1236 |
| | E. Agents told AUSA Hogan of Drug Use "Rumors" | 1237 |
| | F. Second Drug Test Memorandum Provided to AUSA Hogan | 1237 |
| | G. Evans Appeared to be Using Illegal Drugs | 1237 |
| | H. Harris Told U.S. Attorney Paralegal of His Refusal to Take Drug Test | 1238 |
| IV. | Government's Failure to Disclose or Investigate Evidence of its Witnesses' Illegal Drug Use | 1238 |
| | A. Positive Drug Test Results | 1238 |
| | B. Reports of Illegal Drug Use | 1239 |
| | C. "Rumors" of the Drug Use | 1240 |
| | D. Henry Harris' Refusal to Take Drug Test | 1240 |
| | E. Harry Evans' Appearance | 1241 |
| V. | Undisclosed Benefits Given to the "El Rukn" Witnesses | 1241 |
| | A. "Contact" Visits and Lax Security for the "El Rukn" Witnesses | 1241 |
| | 1. "Contact" Visits at the U.S. Attorney's Office | 1241 |

| | | | *Page* |
|---|---|---|---|
| | 2. | Lax Security | 1243 |
| | | (a) The "EL RUKIN GUARD DUTY REPORT" | 1243 |
| | | (b) "El Rukn" Witnesses Smuggled Contraband Items Undetected | 1244 |
| | 3. | Contact Visits and Lax Security Contributed to Drug Acquisition, Possession and Use | 1245 |
| B. | | Telephone Services for the "El Rukn" Witnesses Through the U.S. Attorney's Office | 1246 |
| C. | | AUSA Hogan's Intercession with MCC Officials for the "El Rukn" Witnesses | 1246 |
| D. | | Other Undisclosed "Benefits" | 1247 |
| | 1. | Sundry Items Provided to the Witnesses | 1247 |
| | 2. | U.S. Attorney's Office Paralegal Corinda Luchetta | 1248 |

DISCUSSION AND APPLICATION OF THE LAW — 1249

I. United States Attorney's Responsibility to Justice — 1249
II. Supreme Court's Articulation of the Government's Constitutional Obligations — 1250
III. Proof of a Constitutional Violation — 1251
 A. The Prosecution Suppressed the Evidence — 1251
 1. Government Personnel had Knowledge of the Undisclosed Brady Material — 1251
 (a) AUSA Hogan had Personal Knowledge of the Undisclosed Brady Material — 1252
 (b) Other U.S. Attorney Personnel had Knowledge of Undisclosed Brady Material — 1253
 (c) Other Government Personnel had Knowledge of Undisclosed Brady Material — 1253
 (d) Brady Evidence was "Readily Available" to the Prosecution Which Imputes Knowledge for Brady Purposes — 1254
 (e) Government Required by Brady to Inquire Further into Facts — 1254
 (f) The Government had an Obligation Under Brady to Disclose Facts Which Constituted the "Tip of the Iceberg" — 1258
 2. No Other Facts Excuse the Government's Non–Disclosure of the Brady–Giglio Material — 1259
 (a) Government Counsel Resisted and Did Not Comply with Defense Trial Subpoenas — 1259
 (b) The Brady Material was not Available from the "Public Record" — 1261
 B. The Suppressed Evidence was Favorable to the Defense — 1264
 1. The Illegal Drug Use Was Relevant to the Witnesses' Abilities to Recollect and Relate — 1264
 2. Government Benefits Facilitating Drug Use were Relevant to the Witnesses' Credibility — 1265
 3. Defendants were Deprived of Their Constitutional Confrontation Rights by Failure to Disclose Drug Use — 1266
 C. The Suppressed Evidence was Material — 1267
 1. The Suppressed Evidence was Admissible as to Government Witnesses' Bias — 1268
 2. The Credibility of Government Witnesses was Essential to Government's Obtaining Defendants' Convictions — 1268
 3. The Suppressed Evidence was not Cumulative as to Government Witnesses' Credibility — 1269
 4. Government Counsel's Admissions and Conduct Point Toward a Finding of Materiality — 1270
 D. Knowing Use of Perjured Testimony — 1271
 E. The Proper Remedy — 1272
CONCLUSION — 1272

**1222**

*PROCEDURAL HISTORY OF THE CASE*

Two indictments were filed on October 26, 1989 against a total of 65 alleged El Rukn gang members and associates. The first indictment filed was entitled *United States v. Henry Andrews, et al.,* 89 CR 908 (N.D.Ill.). It charged 38 defendants with various crimes and was assigned initially to Judge Marvin E. Aspen's calendar. The second indictment, which was assigned to this court, was *United States v. Michael Anderson, et al.,* 89 CR 909 (N.D.Ill.). It alleged similar offenses and named 27 defendants. The defendants charged in one indictment were named as unindicted co-conspirators in the other indictment. The allegations of criminal conduct in each indictment spanned a period of over twenty years. Among the criminal violations alleged were offenses involving the Racketeer Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1961 *et seq.,* including RICO conspiracy (18 U.S.C. 1962(d)); narcotics conspiracy (21 U.S.C. § 846); and narcotics distribution (21 U.S.C. 841(a)(1)); as well as substantive RICO charges (18 U.S.C. 1962(c)), which alleged numerous racketeering acts and offenses including allegations of multiple murders, kidnapping (18 U.S.C. § 1952B(a)(1)), witness intimidation (18 U.S.C. § 1512(b)(3)), and witness retaliation (18 U.S.C. § 1513(a)(1)).

In Case No. 89 CR 908, Judge Aspen entered pretrial orders severing the trials of various defendants. *See United States v. Andrews,* 754 F.Supp. 1161 (N.D.Ill.1990); *United States v. Andrews,* 754 F.Supp. 1197 (N.D.Ill.1990). Thereafter, several federal district judges, including district judges from outside the Northern District of Illinois, presided over the trials of the various severed defendants indicted in Case No. 89 CR 908.[3]

This court presided over the proceedings in Case No. 89 CR 909, including all pretrial

matters and the two trials which have taken place. In the course of presiding over the pretrial matters in Case No. 89 CR 909, this court ruled on numerous pretrial motions, including motions for severance. Among the pretrial motions filed or adopted by the defendants were motions for disclosure of material pursuant to the constitutional doctrines espoused in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The government in its pretrial response, which was consolidated to encompass all the defendants' *Brady* and *Giglio* motions, stated:

> To be sure, the government is well aware of its obligations under *Brady* and will honor those obligations. At the present time, however, the government is not aware of any *Brady* material pertaining to any defendant. Should any exculpatory information come into the government's possession, it will be promptly disclosed to the appropriate defense counsel(s).

> \* \* \* \* \* \*

> Regarding [*Giglio* ] materials which relate to witnesses whom the government will call in its case-in-chief, the government will provide the defense with information that bears on these witnesses' credibility (such as plea agreements, promises, benefits, inducements, etc.) at time sufficient to allow the defendant to make use of such evidence.

> \* \* \* \* \* \*

> [P]roviding *Giglio* material in the manner proposed herein comports with the law and adequately protects the defendants' due process rights.

(Government's Consolidated Response to Defendants' Motions for Discovery filed June 29, 1990, pp. 5–7.)

---

**3.** In Case No. 89 CR 908, Judge Aspen presided over the first trial, *United States v. Boyd, et al.* Judge Suzanne B. Conlon presided over the second trial, *United States v. Andrews et al.,* 89 CR 908. The other district judges who presided over the trials of other severed defendants in Case No. 89 CR 908 were visiting federal district judges who graciously accepted a request to do so. They were: the Honorable Harold A. Baker of the Central District of Illinois, *United States v. Crowder, et al.,* 89 CR 908; the Honorable Richard Mills of the Central District of Illinois, *United States v. Bates, et al.,* 89 CR 908; the Honorable John Tinder of the Southern District of Indiana, *United States v. Franklin, et al.,* 89 CR 908; and the Honorable Allen Sharpe of the Northern District of Indiana, *United States v. Kitchen,* 89 CR 908.

The two trials in Case No. 89 CR 909, *United States v. Bingham, et al.* and *United States v. Burnside, et al.*, consumed over five months of trial time from April through October 1991. Thirteen defendants were convicted in the two trials. Three defendants were acquitted. Some of the other defendants charged in Case No. 89 CR 909 have pleaded guilty. One defendant was dismissed pursuant to a pretrial motion by the government. The trials of certain other defendants remain to be scheduled.

The first trial in Case No. 89 CR 909, *United States v. Bingham, et al.*, commenced on April 9, 1991. In that trial, fourteen alleged El Rukn gang members who allegedly held the rank of "ambassador" in the El Rukn gang faced charges of RICO conspiracy, narcotics conspiracy, racketeering, and various counts of narcotics distribution. The *Bingham* trial took four months. On August 9, 1991, the jury found ten of the defendants guilty of various criminal violations. Three defendants were found not guilty. A mistrial was declared as to one defendant who subsequently pleaded guilty.

The first trial of defendants in Case No. 89 CR 908, over which Judge Aspen presided, *United States v. Boyd, et al.*, commenced on May 6, 1991 and ended September 1, 1991. The trial before Judge Conlon, *United States v. Andrews, et al.*, began on July 6, 1991 and ended August 25, 1991.

On September 23, 1991 this court started the second trial in Case No. 89 CR 909 (the fourth trial in the series of trials arising from the two "El Rukn" indictments)—the jury trial of defendants Burnside, Griffin and Jackson. *United States v. Burnside, et al.*, 89 CR 909 (N.D.Ill.) ("the *Burnside* trial").

The government's lead prosecutor in the *Burnside* trial was Assistant U.S. Attorney ("AUSA") William Hogan. When the trial concluded on October 31, 1991, defendants

Burnside and Griffin were each convicted of the RICO conspiracy (Count One), the RICO substantive offense (Count Two) and the narcotics conspiracy charge (Count Three). Defendant Jackson was only convicted of the narcotics conspiracy charge (Count Three). Defendant Burnside was additionally convicted of two specific narcotics distribution offenses (Counts Eleven and Twelve).

The post-trial motions filed after the *Burnside* trial asserted, among other things, that the government had withheld information from the defendants' counsel which showed that two key government witnesses, Henry Harris and Harry Evans, had tested positive for illegal drugs while incarcerated at the Metropolitan Correctional Center ("MCC") in Chicago, the federal detention center serving this district court.[4] Similar post-trial allegations were filed by the defendants in the other "El Rukn" trials. Two visiting judges who presided over some of the severed trials in Case No. 89 CR 908, Judge Harold Baker and Judge Richard Mills, denied the post-trial motions in their respective "El Rukn" trials without a hearing or consideration of further post-trial evidence.

Judge Conlon and this court both ordered evidentiary hearings, over the government's opposition,[5] into the defendants' post-trial allegations. Judge Aspen delayed the execution of the sentences he imposed as to the defendants convicted in the *Boyd* trial until further determinations could be made regarding the evidence adduced at post-trial hearings and the submission of further briefs.

The evidentiary hearing before this court as to the *Burnside* trial was scheduled to begin October 13, 1992.[6] It was delayed at the request of the then United States Attorney for the Northern District of Illinois,

4. The MCC is operated by the United States Bureau of Prisons, which is a part of the United States Department of Justice. It is located two blocks from the federal courthouse in Chicago and houses short-term federal prisoners and federal pretrial detainees as required by the federal courts in Northern Illinois and Indiana.

5. *See* Government's Response to Defendant Jackson's Motion for an Evidentiary Hearing filed March 16, 1992.

6. The transcript of the post-trial evidentiary hearing conducted by this court is designated by page numbers preceded by the letter "H.". The trial transcript is designated "H.Tr." followed by the page citation.

Fred Foreman,[7] so an "internal investigation within the U.S. Attorney's Office" (Transcript of Proceedings of October 13, 1992, p. 5) could be conducted into information that had been received by the U.S. Attorney's Office from a former AUSA, Lawrence Rosenthal. Rosenthal had reported that he talked to AUSA Hogan in 1989 about a drug test report he, Rosenthal, had received regarding certain "El Rukn" witnesses. None of this had been disclosed by AUSA Hogan to the defense in the *Burnside* trial.

Judge Conlon denied a similar request by then U.S. Attorney Foreman for a delay of the evidentiary hearing scheduled to commence before her. The post-trial evidentiary hearing before Judge Conlon in *United States v. Andrews, et al.*, 89 CR 908, began as scheduled on October 15, 1992,[8] and former AUSA Rosenthal was called to testify on that day.

On November 16, 1992, this court began the post-trial evidentiary hearing regarding the *Burnside* trial. That hearing proceeded on an intermittent basis over the following six weeks and ended on December 31, 1992. A total of 37 witnesses testified before this court at the post-trial hearing. The testimony of other witnesses was presented by stipulation of the parties (*see* November 18, 1992 Stipulation). In one instance, the testimony of one witness, whose credibility the government does not contest, was presented as an admission by the government. (H. 4709–10.) The post-trial evidentiary hearing over which Judge Conlon presided also proceeded on an intermittent basis and concluded January 5, 1993.

Following the conclusion of the post-trial hearings conducted by Judge Conlon and this court, the government disclosed a significant amount of additional *Brady* information which had not been previously revealed. This information included government documents, notes of witness interviews, and witness statements. (*See e.g.*, Government's Filing of January 20, 1993; Government's Filing of February 10, 1993; Government's Filing of February 19, 1993; Government's Filing of March 12, 1993; Government's Filing of March 31, 1993; Government's (in camera) Filing of April 30, 1993; Government's (in camera) Filing of May 6, 1993; Transcript of Proceedings of May 14, 1993; and Government's Submissions of May 26, 1993.)

On May 24, 1993 Judge Aspen conducted a further evidentiary hearing as a result of further *Brady* information revealed in late April 1993.

### FACTUAL FINDINGS AS TO POST–TRIAL EVIDENCE

Having reviewed the evidence which was presented during and after the post-trial hearings, the court must conclude that key government cooperating "El Rukn" inmate witnesses, who had long-standing histories of drug usage, continued to use illegal drugs during the period of their incarceration and post-arrest, post-plea cooperation with the government. The evidence indicated that the post-arrest illegal drug use commenced in 1988, and encompassed the period during which the government witnesses testified before the grand jury in 1989. It also included the time period during which the witnesses testified at the *Burnside* trial, September and October 1991, as well as the various other "El Rukn" trials.

On the basis of the totality of the post-trial evidence, the court must also find that government personnel, including U.S. Attorney's Office personnel, were aware of the continuing drug use by these inmate government witnesses, but did not investigate it, did not stop it, and did not disclose it to defense counsel or the court before or during the

---

7. United States Attorney Foreman subsequently recused himself effective December 7, 1992 from supervisory control over the "El Rukn" cases. His recusal was accepted by the Department of Justice, and John A. Smietanka, the United States Attorney from the Western District of Michigan, was appointed Acting United States Attorney for this District as to the "El Rukn" matters. (H. 3866–67.) Mr. Foreman has since resigned his position as U.S. Attorney for the Northern District of Illinois.

8. The transcript of the evidentiary hearing conducted by Judge Conlon is designated by page numbers preceded by the letter "C". Transcript of the trial before Judge Conlon is designated "C.Tr." followed by the page citation.

*Burnside* trial. Further, substantial undisclosed benefits were provided to the government's cooperating "El Rukn" inmate witnesses by government personnel. These "benefits" included money, gifts, clothing, radios, beer, cigarettes, services and privileges, including the government providing means by which the witnesses' acquisition, possession and use of illegal drugs was facilitated. The evidence which underlies these conclusions is discussed below.

## I. THE GOVERNMENT'S COOPERATING "EL RUKN" WITNESSES

Henry Leon Harris and Harry Evans, who formerly were high ranking "generals" of the El Rukn organization, were both government witnesses at the trial of defendants Burnside, Griffin and Jackson. Government cooperating "El Rukn" inmate witnesses Earl Hawkins and Ervin Lee also provided testimony at the *Burnside* trial.

The jury's assessment that these government witnesses were credible was important to the success of the prosecution's case. (H. 74–75.) Harris provided the key testimony as to the defendants' alleged involvement as suppliers of illegal drugs to the El Rukn organization, which led to defendants' convictions. (H. 74.) Both Harris and Evans, along with Hawkins and Lee had pleaded guilty to felony charges and testified at the *Burnside* trial pursuant to plea agreements with the government.[9] Harris, Evans and Hawkins have yet to be sentenced. They are scheduled to appear before Judge Aspen on June 21, 1993 for further proceedings.

Harris and Evans were incarcerated at the MCC in Chicago for most of the time between the date of their arrests in the summer of 1988 and their testimony on behalf of the government at the various "El Rukn" trials. Commencing in the summer of 1988 and throughout the fall of that year, Harris and Evans were housed, at the request of the U.S. Attorney's Office, in protective custody on the MCC's 6th floor. (H. 902.) Hawkins and Lee were housed there at various times as well.

## II. THE GOVERNMENT'S WITNESSES' ILLEGAL DRUG USE

The proof which was presented post-trial leads the court to conclude that Harris and Evans, who had used illegal drugs extensively before their arrest in the summer of 1988, continued their illegal drug use while incarcerated and cooperating with the government before, during and after the trials in the "El Rukn" cases. The evidence supporting this conclusion is abundant and comes in several forms: 1) drug test results, 2) eyewitness testimony, 3) admissions made by the witnesses themselves, and 4) other circumstantial proof. The court will detail these various categories of evidence.

### A. *Positive Drug Test Results*

The MCC employs urinalysis testing in order to detect whether its inmates have ingested illegal drugs. In the spring of 1989, Evans and Harris each tested positive for the unauthorized presence of morphine in urine specimens they provided on April 12, 1989 (Evans) [10] and May 11, 1989 (Harris). (Defendants' Exhibit MCC Urine Surveillance Log.)

A positive urine test for morphine is indicative of a person having ingested an opiate, such as heroin. According to publications of

---

9. Paragraph 11 of Harris' and Evans' respective plea agreements required each of them to:

> [C]ooperate fully with the government in any investigation in which he is called upon to cooperate that is related to or results from the charges in this case [and] ... to provide complete and truthful information to state and federal investigators, including truthful testimony, if called upon to testify, before any state or federal grand jury and United States District Court or Circuit Court of Cook County proceeding.

As stated in paragraph 18 of each of their plea agreements, Harris and Evans acknowledged they each understood that the

> failure to abide by any term of the plea agreement is a violation of the agreement rendering it null and void.

(Defense Exhibit Harris Plea Agreement; Defense Exhibit Evans Plea Agreement.)

10. Evans tested positive for morphine again on May 10, 1989, but he had received authorized medication which would have produced a positive test for morphine during the detectible period before taking that drug test.

PharmChem Laboratories, Inc. (the drug testing company employed by the U.S. Government to conduct drug tests (H. 357)), heroin is usually detectable in a morphine state for a period of two to four days after use. Cocaine ingestion is usually detectable in the form of cocaine metabolites in urine for a period of up to two days. *See* Pharm-Chem *Newsletter* (May 1987). The Bureau of Prisons' estimates that the maximum detection period after illegal drug ingestion is approximately 72 hours. (C. 211–12.)

According to the MCC's records, neither Evans (C. 251–53) nor Harris received any authorized medication which would have caused a positive test for morphine during the detectible period before providing their April 12, 1989 (Evans) and May 11, 1989 (Harris) specimens.[11] The only reasonable inference based on all the evidence is that Harris' and Evans' morphine positive tests were from heroin ingestion.

The 1989 drug tests were the only positive drug tests of Harris and Evans put into evidence. The fact that Harris and Evans did not test positive after the spring of 1989 does not, however, demonstrate that they did not use drugs after that time. As is discussed below, Harris, Evans and other cooperating "El Rukn" inmate witnesses were not administered any urinalysis tests after October 1989 through the period of their testimony in the "El Rukn" trials. The only other drug test attempted on either Harris or Evans after October 1989 was a random test of

Harris on May 30, 1991, at which Harris refused to be tested. Other post-trial evidence indicates that the Harris' and Evans' illegal drug use, as well as drug use by other government inmate witnesses in the "El Rukn" trials, such as Earl Hawkins and Derrick Kees, continued during and after their trial testimony.

### B. *Eyewitnesses to the Illegal Drug Use*

At the post-trial hearing, five witnesses provided eyewitness testimony of Harris' and Evans' illegal drug usage during their incarceration at the MCC.[12] These eyewitnesses were primarily convicted felons who had themselves been incarcerated at the MCC and had cooperated with the government or were presently cooperating with the government in other federal criminal cases.

### 1. *Nicholas Ahrens*

Nicholas Ahrens, who is a convicted felon but is no longer in custody, was housed on the 6th floor of the MCC from September 1988 to October 1989. While housed at the MCC, Ahrens had cooperated as a government witness and testified for the government in the multi-defendant RICO and narcotics conspiracy case, *United States v. John Cappas, et al.*, Case No. 88 CR 91 (N.D.Ill.) (Kocoras, J.), in which Ahrens had pleaded guilty. Ahrens observed Harris' and Evans' use of illegal drugs while incarcerated beginning in the fall of 1988.

Ahrens testified at the post-trial hearing that on one of the occasions when Harris

---

11. Contrary to the government's statement that "Evans' April 12, 1989 test was also authorized," (Government's Brief in Opposition, p. 8), Government Exhibit Russell 2, which was created after Harry Evans' urine specimen of April 12, 1989 tested positive for codeine and morphine, states that Evans had taken medication which would produce a positive drug test for codeine but did not mention any authorized medication which would have tested positive for morphine.

12. Additional information provided by other eyewitnesses to the illegal drug use was filed after the post-trial hearings. (*See* Government's Filing of February 10, 1993; Government's Filing of March 12, 1993; Exhibit B to Defendant's Motion to Submit Additional Evidence filed April 9, 1993.) On May 26, 1993, the government provided the court and defense counsel a copy of a March 19, 1993 FBI Interview of cooperating government "El Rukn" witness Derrick Kees.

Kees testified for the government in several "El Rukn" trials and in *United States v. Maloney, et al.*, 91 CR 477 (Leinenweber, J.) In its report of that March 19, 1993 interview of Kees, the FBI stated:

When asked about drug use, KEES said that EVANS and HARRIS were drug addicts and they used drugs consistently from 1989 through the trials in 1991. He saw both EVANS and HARRIS with karachi (a heroin based substance) on numerous occasions. On at least one occasion, he saw HARRIS put drugs in his sock. He advised that it was pretty obvious that EVANS was using drugs because sometimes he would nod off right in front of you.

EVANS and HARRIS were both getting drugs from their girlfriends who would smuggle it in during visits at the MCC, the ATF office or at the USAO [U.S. Attorney's Office].

appeared "high on something," Harris bragged to Ahrens that he, Harris, was getting heroin during visits with his wife or girlfriend in the Dirksen Building. (H. 2804.) Ahrens testified that the first time he actually saw Harris "snort" heroin was while Harris and he were in a holding cell in the Dirksen Federal Building[13] in the fall of 1988. (H. 2805.)

Ahrens testified that, in the fall of 1988, he and Harris were in one of the Dirksen Building's holding cells late one afternoon waiting to be returned to the MCC.[14] (H. 2807.) After Harris snorted the substance, he showed the substance to Ahrens and told Ahrens it was heroin. (H. 2805; C. 939.) Ahrens did not see from where Harris had obtained the heroin. (H. 2807.) After he completed snorting the heroin, Harris had some heroin left and offered it to Ahrens. (H. 2807; C. 939.) Ahrens declined Harris' offer and did not see where Harris put the excess heroin he possessed.[15] (H. 2807.)

### 2. Raymond Bonnema

Another eyewitness to Harris' illegal drug possession and use was Raymond Bonnema.

**13.** The Everett McKinley Dirksen Federal Building ("Dirksen Building") is located at 219 S. Dearborn Street in Chicago, Illinois. It houses the United States Court of Appeals for the Seventh Circuit, the United States District Court for the Northern District of Illinois, the main office of the U.S. Attorney for the Northern District of Illinois as well as other federal offices such as the FBI and the probation department of this court.

**14.** Near the outset of the post-trial hearing, government counsel induced defense counsel to enter into an erroneous stipulation that Harris was housed at the MCC starting April 4, 1989 (November 18, 1992 Stipulation, ¶ 5, p. 3). Records of the U.S. Marshal's Service produced pursuant to this court's request during the hearing (H. 172–77), show, however, that Harris was incarcerated at the MCC and transported to the Dirksen Building on several occasions during the month of July 1988 and again during the period October and November 1988.

**15.** Some of the U.S. Marshal's Service transportation records from the fall of 1988 are no longer available. The records as to inmate witnesses' transportation which are available revealed that Ahrens and Harris were transported between the MCC and the Dirksen Building on the same day once during that time period. (Defense Exhibit

Like Ahrens, Bonnema is a convicted felon and had also testified for the government in the *Cappas* case. Bonnema testified at the posttrial hearing that he was housed on the 6th floor of the MCC from approximately March 1989 until March 1990. (H. 1782.) Bonnema testified he observed Harris in approximately April 1989 snort white heroin in the holding cell on the fifth floor of the MCC on a morning when Bonnema and Harris were being transported together from the MCC to the Dirksen Building.[16] (H. 1786.)

Bonnema saw the white substance Harris was snorting in a little baggy and asked Harris if the substance was cocaine. Harris told Bonnema "No, it was heroin" and offered some to Bonnema, who declined. (H. 1786.) Bonnema also saw Harris on another occasion "snorting something out of a little white piece of paper" while in the telephone room of the sixth floor of the MCC. (H. 1788; C. 748.)

### 3. "John Doe"[17]

"John Doe," whose credibility the government does not dispute (H. 4803; Transcript

Hogan–Harris Visitation Memo; Defense Exhibit Ahrens Visitation Memo.)

**16.** Records of the U.S. Marshal's Service show that Bonnema and Harris were transported from the MCC to the Dirksen Building together three times during the period April and May 1989. On May 11, 1989, Harris provided the urine specimen which produced the undisclosed positive drug test for morphine. Harris testified before the grand jury on May 18 and May 25, 1989. (H. 106.) Harris later told another government cooperating inmate witness, Ervin Lee, that he, Harris, was "high" when he testified before the grand jury. (H. 3213; 3228–29.) The U.S. Marshal Service's records show Harris was brought to the Dirksen Building to see Hogan six times in May of 1989 after May 11, the day he provided the urine specimen that tested positive: May 12, 16, 17, 18, 24, and 25, 1989. (H. 197–98.) (Defendants' Exhibit Hogan–Harris Visitation Memo.)

**17.** "John Doe" was a pseudonym used to avoid the public disclosure of the eyewitness' real identity. It is now known that "John Doe" is Michael Corbitt who was convicted in 1989 before Judge James Zagel in Case No. 88 CR 500. Corbitt's conviction was affirmed. *United States v. Masters*, 924 F.2d 1362 (7th Cir.1991).

of Proceedings of May 14, 1993, p. 43.), was another eyewitness to the illegal drug usage by Harris and other cooperating government witnesses in the "El Rukn" case who were MCC inmates. (H. 4708–10.) "John Doe" was an inmate in the MCC while Henry Harris, Harry Evans, Eugene Hunter and other inmates cooperating with the government in the "El Rukn" cases were housed on the 6th floor of the MCC. The government admitted at the hearing that if "John Doe" were called to testify at the hearing, he would testify as follows:

While at the MCC, John Doe had access to the 6th floor area in which government witnesses were located.

While on the 6th floor of the MCC, John Doe observed that witnesses Harris, Hunter, and other—and others regularly received visits from African–American women whom John Doe is not able to identify by name. These visits took place in an area of the 6th floor in which prisoners and visitors were supposed to be separated from each other by a wall or partition with a glass window.

John Doe observed that Hunter, Harris, and other government witnesses, were able to obtain access to the visitors' side of this partition and make physical contact with the female visitors. On several occasions, John Doe observed the government's cooperating witnesses on the floor of the visitors' side of this partition engaging in sexual contact with the female visitors. John Doe describes these events as a regular occurrence, which he defines as occurrences of up to four times per week.

Following various of these visits to these witnesses, the government witnesses would state to John Doe that the female visitors had provided drugs to the government witnesses during the preceding visits. On one occasion, Harris produced a small container and identified its contents as cocaine, stating that he had obtained the cocaine during a recent visit from a female visitor. On other occasions, John Doe saw other cooperating government witnesses in possession of powdered substances which he believed to be drugs.

John Doe also saw [Eugene] Hunter in possession of an amount of cash, which John Doe identifies as approximately $2,000 to $3,000. Hunter maintained this cash in one of the gym shoes he wore while at the MCC.

John Doe was told by Hunter, Harris and other cooperating government witnesses that Assistant United States Attorney William Hogan had made efforts to intercede with the Warden of the MCC, at the request of the government witnesses, on topics involving the quality of food and other jail amenities. The cooperating witnesses stated that the Warden of the MCC was irritated by the efforts of AUSA Hogan to intercede on such topics, and that Hogan thereafter declined to contact the Warden at the request of the cooperating witnesses.

(H. 4709–10.)

Additionally, in a further interview with FBI agents on May 3, 1993, "John Doe" stated, among other things, that "he observed Harris and Evans snort cocaine and/or heroin in the MCC on a number of occasions." (Transcript of Proceedings of May 14, 1993, p. 46.)

"John Doe" stated it was Evans who had money in the MCC not Hunter as "Doe" had previously stated. "John Doe" also stated that "Harris was high on drugs from almost the time he arrived" at the MCC and that illegal drugs such as "heroin, marijuana and cocaine" were "smuggled in for Harris and Evans via their wives and/or girlfriends." "John Doe" also stated "on a number of occasions, he witnessed Harris and Evans, as well as other El Rukn witnesses, obtain drugs and engage in sexual contact with many of these female visitors." "John Doe" further stated "he also witnessed these females provide Harris and Evans drugs in condoms or balloons, which they swallowed, and then request "Ex Lax" in order to quickly pass the condoms and/or balloons." "John Doe" also stated he observed Hawkins, Clay and Kees smoking marijuana on a number of occasions. "John Doe" further stated that "during conversations with Hawkins, Harris and Evans, he [John Doe] learned that they [Hawkins, Harris and Evans] were able to

have sexual contact and obtain drugs from their visitors while at the United States Attorney's Office." (Transcript of Proceedings of May 14, 1993, pp. 44–49.)

#### 4. *Jackie Clay*

Another government "El Rukn" inmate witness, Jackie Clay, testified under a grant of immunity that he saw Harry Evans and Henry Harris use narcotics at the MCC. (H. 4620–25.) The first time was in 1989. (H. 4621.) Clay observed Evans in the "rec room" of the 6th floor of the MCC with narcotics laid out on the ledge near the pay telephone. (H. 4621.) The substance Evans snorted was a brown powder and it was packaged in aluminum foil. (H. 4622.) Evans used the end of a matchbook to scoop up and inhale the drugs. After doing this three or four times in the "rec room" phone area, Evans folded the aluminum foil containing what was left of the brown substance and put it in the breast pocket of his prison uniform jumpsuit. (H. 4623.) On that same occasion, Clay observed Henry Harris also snort some of the brown substance which Evans had. (H. 4625.)

On another occasion during that same period between the spring and fall of 1989, Clay observed Evans making a telephone call on the 6th floor of the MCC. While Evans was on the telephone, Clay observed Evans pull a folded aluminum foil packet out of his sock, open it up and snort drugs. (H. 4626–27.)

Also during that same time period, but on another occasion when Clay was in the library of the 6th floor of the MCC with Harris and Evans, Evans took aluminum foil from his sock, and put it on the table in the library. Evans and Harris snorted the substance. (H. 4627–30.)

#### 5. *Harry Martin*

Another witness, Harry Martin, who was housed in the 6th floor of the MCC during 1991 (H. 4316), testified at the posttrial hearings on December 30, 1992 that throughout the time he was at the MCC, drugs were accessible on the 6th floor of the MCC where the government's "El Rukn" cooperating witnesses were held. (H. 4325.) Martin also testified at the 1992 posttrial hearings that during the first week of December 1991 he picked a package of cocaine out of Harry Evans' pocket at the MCC. (H. 4322–24.) Martin also testified that he observed Harry Evans smoking cocaine on the 6th floor of the MCC during the third week of December 1991. (H. 4321–22.) Harry Martin was interviewed by FBI agents on April 22, 1993, and testified at the May 24, 1993 hearing before Judge Aspen. In his 1993 testimony, Martin stated he lied when he testified there was a conspiracy among certain witnesses to discredit AUSA Hogan at the December 1992 posttrial hearing.

Martin testified that he, Martin, had personally told Hogan in early fall 1991 that Harry Evans was using drugs. Martin also testified that during the first "El Rukn" trial (Summer 1991), he told AUSA Kristina Anderson about Evans' drug usage. According to Martin, AUSA Anderson responded "Again?," and thereafter told Martin that she would tell AUSA Hogan about the drug use.

Martin stated that Harris had told Martin that he, Harris, had used marijuana, karachi heroin and cocaine. Martin also stated that Harris had said that he had told Hogan in 1989 about failing the drug test. Martin also stated that Harris had said that Hogan's testimony at the 1992 posttrial hearings about never seeing the memo about Harris' positive drug test was a lie. According to Martin, Harris had said he was there when Hogan had received the memo. (*See* Testimony of May 24, 1993; FBI Interview of Martin of April 22, 1993; Defendants' Exhibit Rosenthal Memorandum.)

Martin was subjected to an FBI polygraph examination by the government on May 5, 1993 as to facts he had told the FBI on April 22, 1993. The FBI polygrapher's report regarding that May 5, 1993 polygraph examination concludes as follows:

At the conclusion of this interview Mr. Martin was given a series of polygraph examinations by SA Murphy. It was determined after analyzing the polygraph charts that Mr. Martin was truthful when responding to the following relevant question asked during these tests:

1. Did. you lie under oath during the El Rukn hearing about when Harry Evans used drugs? Answer–Yes

2. Did you make up the story that there was a conspiracy to overturn the El Rukn cases? Answer–Yes

3. Did you personally tell Kristina Anderson during the El Rukn trials that Harry Evans was using drugs? Answer–Yes

4. During the El Rukn trials did you tell Bill Hogan that Harry Evans was using drugs? Answer–Yes

5. While at the MCC did you help Harris prepare for his testimony for the El Rukn trials as you've said? Answer–Yes

6. While at the MCC did Harris, Evans and Clay ever tell you the others were lying in the trials? Answer–Yes

7. Did you ever see Evans with drugs in his possession at the MCC during the El Rukn trials? Answer–Yes

(FBI Polygraph Report of Harry Martin, May 5, 1993.)

AUSA Kristina Anderson testified at the May 24, 1993 hearing before Judge Aspen that Harry Martin did not tell her about Harry Evans' drug use. Hogan continued to deny any knowledge of illegal drug use by any of the government's "El Rukn" inmate witnesses at the May 24, 1993 hearing before Judge Aspen.

This court did not see the demeanor of Martin, Anderson or Hogan as they testified at the May 24, 1993 hearing before Judge Aspen, so the court cannot make a complete evaluation of the credibility of their testimony at that hearing. The court, however, will evaluate in the next section the testimony of the eyewitnesses whose demeanor the court did observe while they were testifying at the 1992 posttrial hearing.

6. *Evaluation of the Eyewitnesses' Credibility*

The eyewitness testimony at the 1992 posttrial hearing regarding Harris' and Evans' illegal drug use came from five convicted felons, Ahrens, Bonnema, Clay, "Doe" and Martin. The court need not make a further credibility assessment as to one of the eye-

witnesses, "John Doe," because the government has conceded the truthfulness of his statements. (H. 4803.) The testimony of the other eyewitnesses whose demeanor the court did observe was consistent with "Doe's" statements. The eyewitnesses' accounts were consistent with one another, and were corroborated by other evidence of illegal drug use, such as the positive drug test results, the admissions by Harris and Evans, and the circumstantial evidence of their drug use. In light of all the facts presented posttrial, both at the hearings and following the hearings, the court finds the eyewitness accounts of the government's cooperating "El Rukn" inmate witnesses' illegal drug use to be credible.

C. *Government's Witnesses' Admissions of Illegal Drug Use*

At the posttrial hearings both Harris (H. 1506; 4196–97) and Evans (H. 2170) denied their own continued illegal drug use and denied having access to drugs while housed on the 6th floor of the MCC. (H. 1532; 2176–77.) Their denials were contradicted not only by the testimony of the eyewitnesses who personally observed the drug use by Harris and Evans, but also by several witnesses to whom Harris and Evans admitted their continued drug use while they were incarcerated and cooperating with government counsel. Among the several people to whom Harris and Evans admitted their illegal conduct were personnel of the U.S. Attorney's Office and other federal agencies.

1. *Henry Harris' Admissions of Illegal Drug Use*

Henry Harris admitted his illegal drug use to a number of people over a substantial span of time, before, during and after the "El Rukn" trials in which he testified.

(a) *Harris' Admission at 1989 Disciplinary Hearing*

The first documented admission Harris made of his illegal drug use was on June 27, 1989 during the disciplinary hearing which resulted from Harris having tested positive for morphine at the MCC on May 11, 1989. Harris, at the disciplinary hearing, asserted

that he, Harris, was "trying to sniff out narcotics on the 6th floor." (Defense Exhibit Harris Incident Report 6–5–89.) Harris stated at his June 27, 1989 disciplinary hearing "I had to indulge in narcotics to keep the heat off me and gain the confidence of other inmates in the unit." [18] (*Id.*)

### (b) *Harris' Admissions To Ervin Lee*

On another occasion, Harris told Ervin Lee, another "El Rukn" inmate who was also a government witness in the *Burnside* trial, that he, Harris, was "high" during his testimony before the grand jury in May 1989, and that he had told "a pack of lies" to the grand jury. (H. 3213.) Harris' admission that he was "high" in the grand jury was corroborated by the testimony of Raymond Bonnema, who saw Harris snorting heroin while being taken to the Dirksen Building where the grand jury sessions were held. (H. 1786.) [19]

### (c) *Harris' Admissions To Tanya Van Blake*

In August 1991, Harris told U.S. Attorney's Office paralegal Tanya Van Blake that he, Harris, drank a heroin-spiked soda pop given him by Harry Evans. (H. 3838–39). When Van Blake told fellow paralegal Corinda Luchetta, Luchetta said "she had heard that version of the story, among others." (H. 3839.)

### (d) *Harris' Admissions To Mustaq Malik*

Harris told his posttrial prison roommate, Mustaq Malik, that he, Harris, used cocaine and heroin while he was at the MCC. (H. 3003.) Harris also told Malik that he, Harris, received drugs during visits with his girlfriend in the U.S. Attorney's Office. (H. 3002–05.)

### (e) *Harris' Admissions To Harry Martin*

Harris, according to the April 23, 1993 FBI interview and the May 24, 1993 testimony of Harry Martin, admitted that he, Harris, had used marijuana, karachi heroin and cocaine and that Harris got his drugs from his visitors. Harris admitted to Martin that he, Harris, had lied when he denied having sex or using drugs while a cooperator. Harris also told Martin that he, Harris, had told AUSA Hogan in 1989 "when he failed the drug test" and that Hogan just passed over it and went on.

Harris also told Martin, according to Martin's FBI interview statements and testimony, that he, Harris, was there when Hogan had received the MCC memorandum (Defendants' Exhibit Rosenthal Memorandum) which reflected Harris' and Evans' positive drug tests for morphine. The memorandum is dated October 18, 1989 and was delivered to the U.S. Attorney's Office on or near that date. It was distributed in the routine practice to AUSA Hogan that same day or the next by the secretary to then First AUSA Ira Raphaelson, Cynthia Ward. Defendants' Exhibit Hogan (Harris) Visitation Memo shows Harris was visiting Hogan at the Dirksen Building on October 19, 1989.

### 2. *Harry Evans' Admissions of Illegal Drug Use*

Harry Evans also made multiple admissions of drug use to various people over a substantial span of time before, during and after his testimony at the "El Rukn" trials.

### (a) *Evans' Admissions to Nicholas Ahrens*

Harry Evans, in the fall of 1988, admitted to Ahrens that he, Evans, had used heroin two or three times since he, Evans, had

---

**18.** Harris, at the post-trial hearing, testified that he lied at his June 27, 1989 disciplinary hearing and that he had not ingested illegal drugs. (H. 1487–88.) The government conceded that it does not know whether or not Harris is telling the truth. (H. 38.) Harris said in his testimony at the post-trial hearing that the reason he tested positive for morphine was that an MCC correctional officer tainted his May 11, 1989 urine specimen which made it test positive for morphine. (H. 1476; 1481–82.) No evidence was adduced to corroborate either of Harris' stories. Neither the story that Harris had to use illegal drugs to gain the confidence of other (unnamed) inmates, nor the story of the tainted urine specimen were credible.

**19.** AUSA Hogan presented Henry Harris before the grand jury on May 18 and 25, 1989. Harris' grand jury testimony on both days consisted primarily of Hogan, not Harris, reading the statement Hogan had prepared for Harris after talking with him. Harris intermittently responded "Correct" or "Yes, sir" when asked by Hogan to affirm what Hogan had read.

begun his incarceration at the MCC in August 1988. (H. 2802.) Evans also told Ahrens that he, Evans, was getting the heroin during visits from his girlfriend while at the Dirksen Building. (H. 2803–04.) Evans also told Ahrens that there were times when he, Evans, passed heroin over to Harris using a "Walkman" radio to conceal the drugs. (H. 2808.) [20]

(b) *Evans' Admissions to "John Doe"*

During conversations with Harry Evans, as well as conversations with Henry Harris and Earl Hawkins, "John Doe" learned that Evans, Harris and Hawkins were able to have sexual contact with and obtain drugs from their visitors while at the U.S. Attorney's Office. (Transcript of Proceedings of May 14, 1993, p. 47.)

(c) *Evans' Admissions Overheard By Lenell Smith*

Additionally Harris and Evans were overheard in April or May of 1992 by MCC inmate Lenell Smith, who was the 6th floor orderly, talking about the drugs Harris and Evans had just "finished tooting." (H. 2691–92.) In May of 1992, on two occasions three weeks apart, Evans asked Smith to get Evans some heroin through the visiting room of the 6th floor at the MCC. (H. 2689–90). Smith declined.

(d) *Evans' Admissions to Harry Martin*

Evans also admitted to Harry Martin more than once to having drugs and obtaining them from visitors. Evans told Martin that he, Evans, had his mother and son get drugs for him. Evans also told Martin that Evans' girlfriend, Beverly, brought drugs to him at the U.S. Attorney's Office. Evans told Martin that one of the ways these visitors could smuggle drugs to Evans was by bringing him food. (FBI Interview of Harry Martin, April

22, 1993; May 24, 1993 Proceedings before Judge Aspen.)

(e) *Evans' Admissions During Monitored Phone Conversation*

On February 19, 1993, a month and a half after the conclusion of the posttrial hearing, the government submitted a memorandum, dated January 28, 1992, which noted that, on the same date, a phone conversation had been monitored by MCC personnel in which Harry Evans complained there was "nothing but a few 'pebbles' [cocaine particles] left in the "object" Evans had just received and that "his brother" [21] had "ripped him off." (Page 1 of attachment to Government's Filing of February 19, 1993.) This further corroborated Evans' illegal drug use. Because the document had not been revealed by the government earlier, Evans could not be asked about it without reopening the hearings.

D. *Circumstantial Evidence of Illegal Drug Use*

In addition to the direct evidence of Harris' and Evans' drug use, such as the eyewitness testimony and the admissions of Harris and Evans, the circumstantial evidence also points toward a finding that Evans and Harris used drugs during the time period they were cooperating with the government. This circumstantial evidence includes: 1) the appearance of Harry Evans, who was described by several witnesses as having the appearance of being on drugs; and 2) the refusal of Henry Harris to submit to a drug test in May 1991, during the trial in the *Bingham* case.

1. *Evans Appeared to be Using Illegal Drugs*

During the time period Spring to Fall 1989, Jackie Clay saw Evans and Harris

---

20. On March 31, 1993, the government revealed that "Walkman" radios such as those used by the government's witnesses to hide their illegal drugs were supplied at government expense by the ATF case agents on the "El Rukn" case. (*See* Government's Submission of Additional Discovery filed March 31, 1993.)

21. Harry Martin also told the FBI that Harry Evans had a brother "who stashes drugs for Evans in the bathrooms at the federal building." Harry Evans' half-brother Ronald Evans was hired to work as a custodian in the Dirksen

Federal Building on June 17, 1991, while the first two "El Rukn" trials were underway. Ronald Evans had an unauthorized key that opened a substantial number of doors in the Dirksen federal building, including the U.S. Attorney's Office and the chambers of judges. Ronald Evans admitted to visiting Harry Evans in the U.S. Attorney's Office more than once. Ronald Evans, however, denied providing drugs for Harry Evans. (FBI Interview of Harry Martin, April 22, 1993; FBI Interview of Ronald Evans, May 4, 1993.)

acting as though they were under the influence of drugs. (H. 4631.) The first time Clay saw Evans under the influence of drugs was in March 1989. (H. 4632.) Clay was housed at the MCC the first time from February 24, 1989 through December 12, 1989. According to Clay, during that period Evans appeared to be regularly under the influence of narcotics. (H. 4632.) During the period September through November 1991, Clay was again incarcerated on the 6th floor of the MCC. During this period Clay again observed Harry Evans acting as if he were under the influence of narcotics. (H. 4635.)

Personnel of the U.S. Attorney's Office, including three prosecutors and two paralegals, also observed what appeared to be drug-induced behavior by Evans during this period.[22] The AUSAs discussed and speculated that Evans appeared as though "he was on drugs" (H. 4825).

In a March 16, 1993 interview with the FBI, AUSA Theodore Poulos admitted that in the fall of 1991 during the trial before Judge Mills, he, Poulos, suspected Evans of drug use because of his appearance and other symptoms Evans displayed. Poulos also "thought that it was possible EVANS could be acquiring drugs while at the USAO [U.S. Attorney's Office] from his mother." (FBI Interview of Theodore Poulos, March 16, 1993, p. 8.) Poulos did not mention his "thoughts" as to Evans' source of drugs during his testimony at the posttrial hearings. (H. 1637–1779.)

Additionally, MCC inmate Lenell Smith testified that Harris and Evans appeared to be under the influence of drugs in April 1992. (H. 2706–07.)

2. *Henry Harris' Refusal to Take Drug Test*

On May 30, 1991, Harris, who had earlier tested positive for the heroin derivative mor-

phine,[23] refused a request by the MCC that Harris submit a urine specimen for a drug test. (Defendants' Exhibit Harris Incident Report 5/30/91.) (H. 1497.) Shortly thereafter, Harris explained to paralegal Luchetta his refusal to provide the urine specimen saying "he was just too tired." (H. 1842–43.) On June 27, 1991, a MCC disciplinary hearing was conducted regarding Harris' refusal to submit to the urinalysis test and a record of the incident was maintained by the Bureau of Prisons. (See Defendants' Exhibit Harris Incident Report 5/30/91.)

Taking into account the minimal effort which submitting urine for a drug test involves, the court finds Harris' excuse of being "too tired" to be a pretext. In light of the other evidence concerning Harris' drug use, the court views his refusal to take the drug test as indicating that he had used illegal drugs and feared that he would have tested positive. He was never tested again.

### III. THE GOVERNMENT'S AWARENESS OF ITS "EL RUKN" WITNESSES' ILLEGAL DRUG USE

Having reviewed the evidence presented at and after the posttrial hearings, the court finds that, during the pre-indictment preparation and the postindictment prosecution of the "El Rukn" cases, including the *Burnside* trial, government personnel were aware of Harris' and Evans' continued drug use. The persons who were aware of the drug use included members of the U.S. Attorney's Office, as well as other members of the "El Rukn" prosecution team, along with other government employees who were closely associated with the "El Rukn" prosecutions.

The evidence shows that certain government personnel were aware of the illegal

---

**22.** These U.S. Attorney's Office personnel were AUSAs William Hogan, John Hartmann and Theodore Poulos and paralegals Corinda Luchetta and Tanya Van Blake. On October 15 or 16, 1991 these prosecutors and Luchetta observed Evans' behavior and discussed with one another that because of Evans' appearance, "you could almost think he was on drugs." (H. 4825.) U.S. Attorney's Office paralegal Tanya Van Blake also observed Evans' behavior in October 1991 and believed Evans was on drugs. (H. 3819–21.)

When Van Blake discussed Evans' apparently drug-induced behavior with paralegal Luchetta, Luchetta told Van Blake "I've talked to Hogan. Leave it alone." (H. 3822.)

**23.** This positive drug test for morphine was of a specimen provided by Harris on May 11, 1989. An earlier attempt was made to test Harris for drugs on April 6, 1989, but, for unexplained reasons no test results were obtained.

drug usage, through their knowledge of the drug test results. or from talking with eyewitnesses to the drug use. Some government employees heard admissions by the drug using witnesses themselves. Some government personnel heard of the drug use from other government personnel. Additionally, government employees were aware of circumstantial indications, which, had those indications been investigated, would have led to further evidence and further awareness of the witnesses' drug use. The evidence showing the government's awareness of its "El Rukn" inmate witnesses' illegal drug use is discussed below.

### A. *MCC's Warden Told U.S. Attorney Personnel of Illegal Drug Use*

During the Spring of 1989, Arthur Beeler, who was then Warden of the MCC, became aware of a drug usage problem on the MCC's 6th floor, where Evans and Harris were housed. Warden Beeler learned this from reviewing the urinalysis findings in various reports and logs prepared and maintained by the MCC.[24] (H. 915–16.) In October 1989, Warden Beeler spoke with then First AUSA Ira Raphaelson, who was then the U.S. Attorney's Office liaison to the MCC (H. 1088), about "inmates on the 6th floor who are using narcotics." (H. 930–31.)

Warden Beeler also described his idea to First AUSA Raphaelson of constructing a "noncontact" visiting area on the 6th floor of the MCC to combat the drug problem caused by the "El Rukn" inmates housed there. (H. 929–30.) Former AUSA Ira Raphaelson recalled "discussions with Warden Beeler about his concerns about contact visits" (H. 1228) and recalls Warden Beeler "expressing concern" about contraband (H. 1228) being smuggled into the MCC. (H. 1228–30.) Raphaelson told AUSA Hogan about "Warden Beeler's concerns of contraband coming to the El Rukns." (H. 1231–32.) No U.S. Attorney's Office personnel, however, looked into the problem any further.

In addition to Warden Beeler's discussions with Raphaelson about drug usage by the

inmates and Raphaelson's discussions with AUSA Hogan about Warden Beeler's "concerns of contraband coming to the El Rukns," *Id.,* Warden Beeler, himself, had approximately a dozen conversations with AUSA Hogan in 1989 (H. 1043) on a variety of topics, such as when the "El Rukn" indictments would be returned, when the arrests would be made, the housing of "El Rukn" individuals, and separating some "El Rukns" from others. Warden Beeler, however, could not recall whether he did or did not talk to Hogan about the 6th floor drug usage at the time. (H. 1044.)

It was Warden Beeler's policy that when any pretrial inmate tested positive for drugs, the Assistant U.S. Attorney assigned to that inmate's case was to be advised of the positive urine results. (H. 907–08.)

### B. *MCC's Warden Provided a Memorandum to the U.S. Attorney's Office Showing Positive Drug Test Results*

On October 18, 1989 (the date of Defense Exhibit "Rosenthal Memorandum" which shows Harris' and Evans' positive drug tests for unauthorized morphine), Warden Beeler's journal reflects the following: "Took information to Ira [Raphaelson] regarding drug use on the 6th floor." Warden Beeler took the October 18, 1989 Memorandum ("Rosenthal Memorandum") with other documents to Ira Raphaelson and left them with his secretary, Cynthia Ward (H. 1047–48), who recalls the October 18, 1989 memorandum. (H. 1824.) Under the normal procedure of the U.S. Attorney's Office, Ms. Ward sent copies of that memorandum to AUSAs Larry Rosenthal and William Hogan. (H. 1142; 1829–31.) Rosenthal received his copy. (H. 45–46.) Hogan denied receiving his copy. (H. 144–46; 150.)

### C. *AUSA Rosenthal Spoke With AUSA Hogan About The Positive Drug Test Results*

Shortly after receiving a copy of the October 18, 1989 memorandum, Rosenthal spoke

---

**24.** Among the reports and logs prepared and maintained by the MCC which evidenced positive drug tests were the MCC Urine Surveillance Log, the lieutenant's log, incident reports, disciplinary hearing documents and reports. (H. 911–923.)

None of the numerous MCC documents which showed the positive drug tests were disclosed by the government to defense counsel before or during the *Burnside* trial.

with AUSA Hogan near Hogan's office in the U.S. Attorney's Office. (H. 46–47.) Rosenthal testified at the posttrial hearings to the substance of that conversation. (H. 46–50.)

Referring to the document which was labeled at the posttrial hearings "Defendants' Exhibit Rosenthal Memorandum," Rosenthal told AUSA Hogan that he, Rosenthal, "thought this [the positive drug test results reflected in the memo] would be a real problem for the investigation." Rosenthal then asked Hogan, "What he was going to do about it." Hogan responded that: "It was not a problem, it was nothing to worry about." (H. 48.)

Rosenthal repeated his "opinion that it would be a problem ... [because] it was discoverable, that it would have to be disclosed to the defense." Hogan again said "It wasn't a problem." (H. 48.) Hogan's demeanor made it clear to Rosenthal that Hogan had discussed that matter all he cared to. (H. 48–49.)[25]

Hogan's responses to Rosenthal's statements about the drug results memorandum indicate Hogan was aware of the information contained therein.

AUSA Hogan denied having the conversation with Rosenthal at the posttrial hearing. (H. 146–47; 157–58; 169; 267.) As Hogan was questioned further by counsel, he, however, conceded:

He [Rosenthal] may have said something to me. I did not hear what he said, if he said what he has related in this court or in front of Judge Conlon, I didn't hear it. (H. 158.)

After observing both Rosenthal and Hogan testify and considering all of the facts, the court must conclude that Rosenthal's testimony is accurate and truthful. Hogan's denial of the conversation with Rosenthal is not credible. Several facts support these conclusions.

Initially, the manner in which the evidence came to light supports Rosenthal's credibility. Rosenthal, in September 1992, related

his recollection of his 1989 conversation with AUSA Hogan to Michael Shepard at a social dinner in Washington, D.C., while they discussed the matters at issue in the posttrial hearings. Rosenthal was unaware at the time of the existence of any documentary corroboration for the information he voluntarily provided Shepard that evening. Later, on October 15, 1992, when former AUSA Rosenthal testified at the posttrial hearing before Judge Conlon, a copy of the document which Rosenthal recalled discussing with AUSA Hogan in 1989 had not yet been found. (H. 12.)

The government, pursuant to this court's suggestion on October 13, 1992, searched the stored U.S. Attorney's Office's files relating to the case which Rosenthal had prosecuted before this court in late 1989, *United States v. Tocco*, 88 CR 841 (N.D.Ill.). In those stored files, a copy of the October 18, 1989 memorandum Rosenthal had described (Defendants' Exhibit Rosenthal Memorandum) was found. (H. 11–12.) The discovery of the Rosenthal Memorandum showed that Rosenthal, despite not having seen the memorandum in three years, had described it with extreme accuracy before Judge Conlon.

Further, the evidence regarding routine office procedures of the U.S. Attorney's Office and the inferences drawn therefrom compel the court to find that the "Rosenthal Memorandum" was received by AUSA Hogan. The discovery of that memorandum in the *Tocco* file, combined with the recollections of former AUSA Rosenthal and Ms. Cynthia Ward, secretary to AUSA Raphaelson in 1989, as well as the October 18, 1989 entry in Warden Beeler's journal: "Took information to Ira [Raphaelson] regarding drug use on the 6th floor," prove conclusively that the memo was delivered to AUSA Raphaelson in the U.S. Attorney's Office. The testimony of Cynthia Ward regarding her routine practice indicates that the memorandum was sent to both AUSA Hogan and AUSA Rosenthal within the U.S. Attorney's Office. Indeed, the court cannot conceive of

---

**25.** Mr. Rosenthal related this 1989 conversation with AUSA Hogan to Michael Shepard, who at the time headed the Public Integrity Section of the Department of Justice, on September 17,

1992 (discussed, *infra*). Mr. Shepard is currently the Interim U.S. Attorney for the Northern District of Illinois.

why a document containing the information found in the "Rosenthal Memorandum" would not have been forwarded to the AUSA whose witnesses were reported implicated in the use of illegal drugs. Further, there was no evidence concerning why or how the document, having been sent to AUSA Hogan by Ms. Ward, would not have come to his attention.[26]

Furthermore, the court must, in making its comparative credibility assessment, consider the motivations of the respective witnesses. The government has not suggested any reason why Mr. Rosenthal, who is currently a high-ranking public official in the legal department of the City of Chicago, would volunteer information and then testify about a subject of such importance in which he currently has no discernible personal or professional interest, if his testimony were not true. Further, the government has not offered an argument why former AUSA Rosenthal, having (undoubtedly) testified truthfully about the drug test memorandum (without knowing it would ever be found), would then, in a second part of his account, testify about the conversation he had with AUSA Hogan in 1989, if the testimony were not true.

In contrast, AUSA Hogan has a readily apparent motive for giving untruthful or incomplete testimony in the face of the posttrial accusations of his misconduct.

### D. *Witnesses told AUSA Hogan of the Illegal Drug Use*

At the posttrial hearing, AUSA Hogan denied knowing of his witnesses' drug use. In addition, however, to receiving the drug test results in 1989 and speaking with Rosenthal about them at that time, AUSA Hogan learned of Harris' and Evans' illegal drug use from MCC inmates who had personally observed Harris, Evans and other cooperating "El Rukn" government witnesses possess and use illegal drugs. This finding is based on evidence and information which was fur-

nished both during and after the posttrial hearing conducted by this court.

#### 1. *Jackie Clay*

Government cooperating inmate witness, Jackie Clay, who was incarcerated on the 6th floor of the MCC with Henry Harris, Harry Evans and the other cooperating "El Rukn" witnesses told AUSA Hogan three or four times in the latter half of 1989 that Harris and Evans were using heroin at the MCC. (H. 4723–31.)

Clay first told AUSA Hogan about the "El Rukn" witnesses using drugs at the MCC in July or August 1989. (H. 4724.) Clay telephoned AUSA Hogan collect to be "patched through" (have his call forwarded) to another person. During this phone conversation with AUSA Hogan, Clay specifically named Harris and Evans as the people using the drugs. (H. 4724.) In September of 1989, Clay called Hogan again "collect" to be "patched through." Clay told Hogan in this conversation "That they were still messing around with drugs." (H. 4728.) In late October 1989 Clay again told Hogan: "[T]he guys was still using drugs over there." (H. 4730.)

AUSA Hogan denied at the posttrial hearing having these conversations with Clay (H. 4810). In light of the totality of the post-trial evidence presented during and after the hearing, the court finds that his denial, like his denial of the conversation with Rosenthal, is not credible.

#### 2. *Harry Martin*

Government witness Harry Martin testified on December 30, 1992 at the posttrial hearing about Harry Evans' possession and use of illegal drugs at the MCC. Martin, however, denied telling anyone in the U.S. Attorney's Office of that drug use because he "did not think they wanted to know." (H. 4345.) In his testimony on May 24, 1993, Harry Martin stated that he had personally told Hogan that Harry Evans was using drugs. Although Martin testified contrary to

---

**26.** It should be noted that Henry Harris told Harry Martin, according to Martin's April 22, 1993 FBI Interview and May 24, 1993 testimony, that he, Harris, was there when Hogan received the "Rosenthal Memorandum". Additionally, it should be noted that the U.S. Marshal's records show Harris was in the U.S. Attorney's Office visiting Hogan on October 19, 1989. (Defendants' Exhibit Hogan–Harris Visitation Memo.)

this on December 30, 1992 at the posttrial hearing before this court, on May 5, 1993, he passed an FBI-administered polygraph exam on this point. In light of all the evidence, and the fact that Martin previously was called as a government witness in the posttrial hearing, the court must give some credence to Martin's testimony that he told AUSA Hogan of the illegal drug use.[27]

### E. Agents told AUSA Hogan of Drug Use "Rumors"

Special Agent William O'Brien, who was assigned to the "El Rukn" task force, along with another "El Rukn" task force investigator Sergeant Daniel Brannigan of the Chicago Police Department, in early 1990 told AUSA Hogan (H. 4768–70) that one of the WITSEC[28] marshals had said: "El Rukn's on the 6th floor of the MCC were bragging about having sex and receiving drugs at the federal building." (H. 4769.) Hogan again did nothing about this information and did not disclose this information to the defense in the Burnside trial.

### F. Second Drug Test Memorandum Provided to AUSA Hogan

In early August 1991, defense counsel in the Andrews trial before Judge Conlon served trial subpoenas on the MCC for records. (H. 81–83.) (Defense Exhibit MCC Subpoena 1 Conlon Trial; and Defense Exhibit MCC Subpoena 2, Conlon Trial.) (H. 136–37.) After receiving the subpoenas, MCC paralegal Charvella Christmas spoke to AUSA Hogan (H. 81–2.) On August 15, 1991, MCC paralegal Christmas furnished defense counsel and AUSA Hogan a memorandum prepared by MCC Special Investigative Supervisor, Lt. Charles Mildner, ("Defendants' Exhibit Mildner Memorandum"). (H. 88.)

Hogan testified at the posttrial hearing that this was the first time he was aware of

"any potential positive drug tests by witnesses." (H. 80.) The 1991 MCC drug test memorandum (Defendants' Exhibit Mildner memorandum), however, contained drug test information which Hogan had seen in 1989 (Defendants' Exhibit Rosenthal Memorandum) and about which he had spoken to Rosenthal. (H. 46–48.) (Defendants' Exhibit Rosenthal Memorandum.) The 1991 Mildner Memorandum, unlike the 1989 memorandum, however, did not reveal that morphine, a heroin derivative, for which there had been positive tests as to both Evans (4/12/89) and Harris (5/11/89) was not the result of authorized medication.

### G. Evans Appeared to be Using Illegal Drugs

Several government witnesses testified to their personal observations of the effect that Harry Evans' continued drug use had on him. Specifically, in October 1991, while the Burnside trial was going on, United States Attorney's Office paralegal Tanya Van Blake suspected Evans was on drugs and became concerned. (H. 3819–21).

AUSA Hogan, during his second appearance on the witness stand at the posttrial evidentiary hearing, admitted: "There were discussions in the late fall [of 1991] about people having concerns about Harry Evans and drug use." (H. 4823.) Hogan testified that the first conversation as to "Evans and drug use" took place "about the 15th or 16th of October [1991]," (H. 4824.) which was while the Burnside trial was going on. Present at the conversation were AUSA Hogan, AUSA John Hartmann and AUSA Theodore Poulos, along with U.S. Attorney's Office paralegal Corinda Luchetta. Hogan recalls AUSA Hartmann saying of Evans at the time: "[T]he way he [Evans] looked up there [on the witness stand] you could almost think he was on drugs." (H. 4825.)[29]

---

**27.** More evidence that Hogan was informed of the drug use comes from Eugene Hunter, who told the FBI that he "gave his opinion to Bill Hogan that he thought Evans was using drugs." (FBI Interview of Hunter, March 19, 1993.) During his post-trial hearing testimony before this court, however, Hunter did not testify to telling Hogan of the drug use.

**28.** WITSEC is an abbreviation for "Witness Security."

**29.** In his March 16, 1993 interview with the FBI, AUSA Poulos provided further evidence that AUSAs working on the "El Rukn" cases suspected Evans of illegal drug use. Poulos stated that, in the fall of 1991 during the trial before Judge Mills, he, Poulos "thought that it was possible

In view of Evans' history of drug use and his having tested positive for drugs while incarcerated, a probable inference would have been that Evans' appearance (described as being like "he was on drugs") resulted from drug use. The government personnel involved, however, contend they attributed Evans' appearance to health problems. Yet, no government personnel suggested Evans be checked for illegal drug use.

### H. Harris Told U.S. Attorney Paralegal of His Refusal to Take Drug Test

On May 30, 1991, Harris who had continued to use illegal drugs after his 1989 positive drug test for heroin derivative morphine,[30] refused to submit a urine specimen for drug testing. (Defendants' Exhibit Harris Incident Report 5/30/91.) (H. 1497.) Shortly thereafter, Harris told U.S. Attorney Office paralegal Corinda Luchetta[31] that he refused to provide the specimen because "he was just too tired." (H. 1842–43.) Although it was Luchetta's job to tell Hogan such information (H.1841), she denied telling AUSA Hogan of Harris' refusal to submit to the drug test. (H.1846.) In light of the other evidence known by the government, the government's knowledge of Harris' refusal amounted to further circumstantial proof of Harris' illegal drug use and the government's knowledge thereof.[32]

### IV. GOVERNMENT'S FAILURE TO DISCLOSE OR INVESTIGATE EVIDENCE OF ITS WITNESSES' ILLEGAL DRUG USE

As has just been discussed, the government, during the course of the "El Rukn"

prosecution, came to possess evidence that certain of its inmate witnesses were using illegal drugs. Neither the direct evidence of the illegal drug use nor any of the facts supporting an inference of drug use were disclosed to defense counsel in the Burnside trial. Furthermore, government counsel, who were aware of the facts indicating that the government's witnesses were using illegal drugs, never investigated the illegal drug use or took any other action to detect or stop the illegal drug use by the cooperating "El Rukn" inmate witnesses.

### A. Positive Drug Test Results

#### 1. Failure to Disclose

As discussed earlier, before the Burnside trial began, two separate memoranda prepared by the MCC, each showing Harris' and Evans' positive drug test results, were delivered to the U.S. Attorney's Office and to AUSA Hogan. The first memorandum was delivered in October 1989 (Defendants' Exhibit Rosenthal Memorandum) and the second memorandum was delivered in August 1991 (Defendants' Exhibit Mildner Memorandum). Both memoranda reflect Harris' and Evans' 1989 positive drug tests for morphine. AUSA Hogan provided neither of the two memoranda to the defense in the Burnside trial.

Moreover, AUSA Hogan discussed the 1989 memorandum with then-AUSA Rosenthal, who pointed out to Hogan that the memorandum "was discoverable [and] that it would have to be disclosed to the defense."

---

EVANS could be acquiring drugs while at the USAO [U.S. Attorney's Office] from his mother." (FBI Interview of Theodore Poulos, March 16, 1993, p. 8.)

**30.** This positive drug test for morphine, which was reported to MCC personnel on June 5, 1989 (Defendants' Exhibit MCC Urine Surveillance Log), was of a specimen provided by Harris on May 11, 1989, the week before Harris testified in the grand jury. An earlier attempt was made to test Harris for drugs on April 6, 1989, but for an unexplained reason it was reported as "no test." Id.

**31.** Ms. Luchetta, in addition to being a paralegal in the U.S. Attorney's Office, has been a member

of the Illinois bar since November 1990. (H. 1835.)

**32.** Additionally, an MCC disciplinary hearing in a jury room in the Dirksen Building regarding Harris' refusal to submit to the urinalysis test was held on June 27, 1991. AUSA Poulos was aware of the disciplinary hearing, which occurred while Harris was testifying in the Bingham trial. (H. 1655–58.) Poulos testified that he did not know that the hearing related to Harris' refusal to take a drug test. (H. 1659–60.) The basis of the disciplinary hearing was, however, described in Bureau of Prisons documents and was therefore known to MCC personnel. (See Defendants' Exhibit Harris Incident Report 5/30/91.)

(H. 48.) Despite receiving the memorandum and despite discussing with Rosenthal that the document would have to be disclosed to defense counsel, Hogan never provided the document nor any of the information contained in it to the defendants' counsel in the *Burnside* trial.

The 1991 memorandum, which also was not provided to defense counsel in the *Burnside* trial, was disclosed to defense counsel in response to a defense subpoena in the *Andrews* trial over which Judge Conlon presided. When, during the *Andrews* trial in mid-August 1991, AUSA Hogan saw the 1991 memorandum, he called MCC Executive Assistant Robert Hafer and "asked him to come over [to court] as fast as he could so [Hogan] could talk to him." (H. 88.) After Judge Conlon allowed the 1991 memorandum (Defense Trial Exhibit MCC–2; Defendants' Exhibit Mildner Memorandum) into evidence at the *Andrews* trial (C.Tr. 5702), Hogan again phoned Hafer and asked him "Please come [to court] as quickly as you can." (H. 89.)

Hogan testified at the post-trial hearing before Judge Conlon that when Hafer arrived he conferred with Hafer outside Judge Conlon's courtroom:

> He [Hafer] explained, extremely briefly, to me what those [disciplinary] procedures were, his familiarity with those witnesses and his oversight involvement in the disciplinary proceedings. He told me that he had had no disciplinary proceedings regarding those people [Harris and Evans]. And that, I think, was about the extent of our conversation.

(C. 226; H. 91–94.) After consulting with Hogan (C.Tr. 5758–83), Hafer testified. During Hafer's testimony, Hogan did not elicit and Hafer did not reveal that neither Evans' April 12, 1989 positive drug test for morphine nor Harris' May 11, 1989 positive drug test for morphine was authorized. Hafer and Hogan also did not disclose Harris' May 30, 1991 drug test refusal and did not disclose the fact that disciplinary hearings had been conducted as to Harris' illegal drug use in 1989 and his drug test refusal in 1991.

Consequently, even though the fact that Harris and Evans had tested positive for morphine in 1989 was revealed to the defen-

dants in Judge Conlon's trial on August 15, 1991 (Defendants' Exhibit Mildner Memorandum), AUSA Hogan made false representations as to the meaning of the positive drug test results reflected on that memorandum. (C.Tr. 6170.)

### 2. *Failure to Investigate*

Following their respective positive drug tests in April and May of 1989, Harris and Evans were both placed on the Urine High Risk Category list of the MCC. As such they were supposed to have been tested for illegal drugs each month until December 1989. (Defendants' Exhibits "Urine High Risk Category" Report.) They were each tested for three months, then again on October 17, 1989. Then the MCC's drug testing of Harris and Evans stopped. No explanation was given for stopping the drug testing. (Defendants' Exhibit MCC Urine Surveillance Log.)

### B. *Reports of Illegal Drug Use*

### 1. *Failure to Disclose*

Government counsel did not disclose to the defense in the *Burnside* trial that the U.S. Attorney's Office had received reports from various sources indicating that the "El Rukn" inmate witnesses were using illegal drugs. For example, the government did not disclose that Warden Beeler discussed drug and contraband related security problems on the sixth floor of the MCC, where the government's "El Rukn" witnesses were housed, with First AUSA Raphaelson in 1989. Additionally, government counsel did not disclose that government cooperating witness, Jackie Clay, who was incarcerated on the 6th floor of the MCC with Henry Harris, Harry Evans and the other cooperating "El Rukn" witnesses, told AUSA Hogan three or four times in the latter half of 1989 that Harris and Evans were using heroin at the MCC. (H. 4723–31.)

### 2. *Failure to Investigate*

After Jackie Clay told AUSA Hogan that other cooperating inmate witnesses were using illegal drugs, Hogan told Clay that he, Hogan, would look into it. (H. 4729.) There

is no evidence, however, that AUSA Hogan performed or requested any follow-up investigation of Clay's statements. Drug testing could have been easily accomplished and the results thereof would have confirmed the presence or absence of drugs. Yet it was not done.

## C. "Rumors" of the Drug Use

There were several events that should have prompted the government to investigate further through drug testing or by other means. One such instance was the report of "rumors" of drug acquisition at the federal building. As discussed, *supra*, Agent O'Brien had given AUSA Hogan information that "El Rukn" witnesses were "bragging about having sex and receiving drugs in the federal building." (H. 4769–72.) Hogan did not disclose the information to the defense in the *Burnside* trial and did nothing to investigate the information. When the "El Rukn" task force agents spoke to cooperating inmate Harry Evans about the "rumors," they instructed Evans "to stop this kind of talk." (H. 4774–75.) The agents, however, did not question Evans about the "rumors" and did not initiate any investigation to determine the facts.

## D. *Henry Harris' Refusal to Take Drug Test*

The government did not disclose to the defense that on May 30, 1991, while the trials in *United States v. Bingham*, No. 89 CR 909, and *United States v. Crowder*, No. 89 CR 908, were going on, Harris, a witness in both trials, refused to submit a urine specimen for a drug test. (Defendants' Exhibit Harris Incident Report 5/30/91.) (H. 1497.)

Shortly thereafter, Harris told U.S. Attorney's Office paralegal Corinda Luchetta of his refusal to provide the urine specimen saying "he was just too tired." (H. 1842–43.) Luchetta denied telling AUSA Hogan at that point of Harris' refusal to submit to the drug test (H. 1846). Harris' refusal to be tested for drugs and Luchetta's knowledge thereof were not disclosed to defense counsel until late 1992, after the posttrial hearings before Judge Conlon had commenced. (H. 2677.)

AUSA Poulos knew of the June 27, 1991 disciplinary hearing that resulted from Harris' refusal to be tested for illegal drugs. (H. 1655–58.) Poulos testified that he was not aware that the disciplinary hearing was based upon Harris' refusal to be tested. (H. 1659–60.) The subject of the disciplinary hearing is, however, clearly described in MCC documents. (*See* Defendants' Exhibit Harris Incident Report, 5/30/91; DHO Report of June 28, 1991.) No MCC documents relating to Harris' May 30, 1991 drug test refusal were provided to the defendants in the *Burnside* trial.

After Harris refused the drug test on May 30, 1991, no further drug tests were conducted on either Harris or Evans throughout the time they remained at the MCC and were testifying at the various "El Rukn trials," including the September–October 1991 trial of the three defendants in the *Burnside* trial.

The May 30, 1991 failed attempt to test Harris for illegal drugs was the last time any such attempt was made. No witness at the posttrial hearings explained why drug tests were not performed on the government's cooperating "El Rukn" inmate witnesses, including Harris and Evans, during the time those witnesses were testifying at the various "El Rukn" trials.

If the government wanted proof whether or not Harris and Evans were using drugs, the government could have easily obtained it through further drug testing. AUSA Hogan knew that the MCC tested inmates. (H. 114.) The MCC could have done the testing. Alternatively, the prosecution could have had it done even more conveniently. The pretrial services section and the probation department have drug testing facilities in the Dirksen Building where the courts and the U.S. Attorney's Office are located. The government requests tests routinely when defendants released on bond or on probation are suspected of illegal drug use. (H. 1752.)

Drug tests could and, in light of the evidence of drug use known to government personnel, should have been performed on these government witnesses. Harris could have been easily tested at the MCC or in the Dirksen Building at any time. He was not. Also, the fluids obtained during one of Evans'

regular, biweekly kidney dialysis sessions could have been tested without any inconvenience to Evans. None of this was done.

### E. *Evans Appeared to be Using Illegal Drugs*

Government counsel did not disclose to the defense that several personnel of the U.S. Attorney's Office, including three prosecutors and two paralegals, observed what appeared to be drug-induced behavior by Evans during the period of the *Burnside* trial.

On October 15 or 16, 1991, AUSAs William Hogan, John Hartmann, and Theodore Poulos observed Evans' apparently drug-induced behavior and discussed with one another and paralegal Luchetta that because of the way Evans appeared, "you could almost think he was on drugs." (H. 4825.) Also not revealed until after the posttrial hearing was the fact that AUSA Poulos "thought that it was possible that EVANS could be acquiring drugs while at the USAO [U.S. Attorney's Office] from his mother." (FBI Interview of Theodore Poulos, March 16, 1993, p. 8.)

U.S. Attorney's Office paralegal Tanya Van Blake also observed Evans' seemingly drug-influenced behavior in October 1991. (H. 3819–21.) When Van Blake discussed Evans' apparently drug-influenced behavior with Luchetta, Luchetta said "I've talked to Hogan. Leave it alone." (H. 3822.) This was not revealed until Van Blake testified under a grant of immunity at the posttrial hearing before this court.

Despite their suspicions, and despite their knowing the MCC tested inmates for drugs (H. 114), none of the government counsel asked the MCC at that time or at any time to test Evans for illegal drug use. As has been discussed, such drug testing could easily have been performed.

### V. *UNDISCLOSED BENEFITS GIVEN TO THE "EL RUKN" WITNESSES*

In addition to the evidence of the illegal drug use and the government's knowledge, nondisclosure and noninvestigation thereof, the proof presented posttrial showed that the government conferred numerous, undisclosed benefits on its "El Rukn" witnesses. This is significant for two reasons, First, the "benefits" evidence bears on the witnesses' bias and motivations for testifying and consequently is relevant to the question of credibility. Secondly, the special benefits bestowed can, in many instances, be viewed as having facilitated the El Rukn witnesses' acquisition and use of illegal drugs. The court will detail the posttrial evidence presented of the benefits granted, none of which was disclosed to defense counsel prior to or during the *Burnside* trial.

### A. *"Contact" Visits and Lax Security for the "El Rukn" Witnesses at the MCC and U.S. Attorney's Office*

The evidence presented posttrial demonstrated that the government provided cooperating "El Rukn" inmate witnesses with the benefit of "contact" visits with girlfriends, wives and other visitors, even though MCC policy officially prohibited these types of visits to those "El Rukn" inmate witnesses. The posttrial proof further showed that the government employed permissive security procedures in connection with the "El Rukn" inmate witnesses' pretrial visits to the U.S. Attorney's Office, as well as with interaction with outside visitors who came to the MCC and the U.S. Attorney's Office. These indulgent policies were not only undisclosed benefits provided to the witnesses, but also helped make the inmate witnesses' illegal drug use possible.

#### 1. *"Contact" Visits Permitted at the U.S. Attorney's Office*

At the MCC, "contact" visits were prohibited on the 6th floor, where the government's cooperating El Rukn inmate witnesses were housed, because of the drug problems on that floor. (H. 931–32.) In order to implement the policy, MCC Warden Arthur Beeler in late 1989 had barriers erected in the visiting area of the 6th floor of the MCC to stop "contact" visits by noninmates with the 6th floor inmates.

Before the "non-contact" visiting barriers were erected, Warden Beeler had been notified of the illegal drug use problems on the 6th floor of the MCC. (H. 915–16.) An example of such notification is a June 20,

1989 Memorandum to Warden Beeler from his assistant Max Nuss which stated as to the 6th floor inmates, among other things, that:

Visits are not supervised for long periods of time, thus permitting inmates and visitors to pass contraband.

\* \* \* \* \* \*

A recent increase in drug use has been detected. (Defendants' Exhibit Nuss memo of 6/20/89.) (H. 1474–75.)

Warden Beeler testified at the posttrial hearing that he was not aware that "El Rukn" cooperating witnesses were having "contact" visits in the United States Attorney's Office during the time "contact" visits were not allowed the witnesses at the MCC. (H. 932.)

On April 10, 1989, Harry Evans was caught engaging in a sexual act during a "contact visit" at the MCC with his common law wife Beverly Wordlow (H. 2180–92; 4200–01.) Evans' visiting privileges at the MCC were consequently revoked. Evans, however, subsequently had "contact" visits with Beverly (H. 2191; 4200–01), in AUSA Hogan's office inside the U.S. Attorney's Office. (H. 2198.) Evans was also allowed "contact" visits with Beverly by AUSA Hogan at 230 S. Dearborn (the Kluczynski Federal Building) after Evans told Hogan "my common law wife is scared to come to the MCC." (H. 2202.)

"John Doe" also provided evidence regarding the contact visits at the MCC. "John Doe" observed that Hunter, Harris, and other government witnesses were able to obtain access to the visitors' side of this partition and make physical contact with the female visitors. On several occasions, "John Doe" observed the government's cooperating witnesses on the floor of the visitors' side of this partition engaging in sexual contact with the female visitors. "John Doe" describes these events as a regular occurrence, which he defines as occurrences of up to four times per week.

"El Rukn" cooperating inmate witness Eugene Hunter has offered posthearing information concerning the contact visits, though he did not mention this information during his testimony at the posttrial hearings. In an interview with the FBI dated March 19, 1993, Hunter related that he had had sexual relations with his wife during visits with her at the Kluczynski Federal Building. Hunter stated that the sexual contacts with his wife occurred "several times but not over five times" while Hunter was being guarded by ATF agents. (See FBI Interview of Eugene Hunter dated March 19, 1993.)

Cooperating El Rukn witness Jackie Clay also gave information to the FBI regarding contact visits in government offices outside the MCC. According to the FBI's summary of the March 10, 1993 interview, Clay stated that:

On visits, Clay would meet with either his wife or ex-wife and he would be either left alone in a room for an hour or two with the door closed. When asked, Clay stated that if had wanted to he could have had sex, but he denied doing so. Clay was never advised that he could have sex but rather law enforcement personnel would say have a good visit. The visits would occur in small offices and the law enforcement officers would knock before they came into the room.

(FBI Interview of Jackie Clay dated March 10, 1993.)

More evidence of the special privilege of contact visits provided to the government's "El Rukn" witnesses was revealed after the 1992 posttrial hearings in the form of a document entitled "EL RUKIN GUARD DUTY REPORT." (Government's Filing of January 20, 1993; Attached to court's January 20, 1993 Minute Order.) This document, which was prepared by ATF agents, states in the last paragraph: "Wives are not checked for weapons or contraband prior to *witness contact.*" (emphasis added.)

AUSA Hogan in his posttrial hearing testimony denied that contact visits were permitted, testifying that, though visits were allowed, "they [the witnesses] were never allowed any contact." (H. 241.) Hogan's testimony was contradicted by the evidence, including that provided by the ATF agents (H. 4555–56; 4785) and by the witnesses themselves (H. 1614; 2198).

### 2. *Lax Security*

Any security problems caused by the "contact visits" were exacerbated by the lax security measures which characterized the government's approach to its "El Rukn" inmate witnesses. The posttrial proof showed that the government's inadequate security methods allowed the inmate witnesses to receive contraband undetected and to transport the contraband, undetected, back into the MCC.

### (a) *The "EL RUKIN GUARD DUTY REPORT"*

Evidence of the government's slack approach to security is documented in the "EL RUKIN GUARD DUTY REPORT" (hereinafter "REPORT"), which was disclosed for the first time on January 20, 1993, after the posttrial hearings had concluded. The "REPORT" was written two years earlier in January 1991 by ATF agents involved with pretrial security duties while the "El Rukn" inmate witnesses were at the task force offices on the 39 floor of the Kluczynski Building, presumably for pretrial preparation.

That 1991 REPORT states in part as follows:

> El Rukin witnesses have unlimited access to telephone service in Task Force office on 39th floor (long distance, toll, forwarding etc., a dangerous practice for case security and officer safety).

> El Rukin witnesses answer Task Force office telephones on 39th floor of the 230 S. Dearborn Federal building. In some instances they answer phone "ATF," this practice could confuse Federal or State authorities when calling, leading them to believe the person on the other end of the line is an ATF employee, this situation may jeopardize this case, other cases, and officer safety.

> \*　\*　\*　\*　\*　\*

> Work space for El Rukin witnesses on 39th floor of the 230 S. Dearborn Federal building are not checked periodically for weapons and contraband. Special Agent Jassen found a pair of large scissors in an accessible desk drawer in early January of 1991.

> El Rukin witnesses offered agents an opportunity to watch pornographic videos from a collection kept in task force work spaces for El Rukin witnesses on 39th floor of the 230 S. Dearborn Federal building. The offer was not accepted but points out that such practice may have been common in the past. (The watching of videos not related to the investigation is wasteful of agent and witness time and may cause problems later in court).

> El Rukin witnesses are allowed visits from wives on 39th floor of the 230 S. Dearborn Federal building. Wives are not checked for weapons and contraband prior to witness contact (the practice could be dangerous for agents and may be a wasteful practice).

(Government's Filing of January 20, 1993.)

Although the government has argued that the descriptions advanced in the report are inaccurate, the government objected to reopening posttrial hearings so the statements in the REPORT could be fully explored. Therefore, the authors of the REPORT were never subject to examination under oath before this or any other court. Unlike the government's after-the-fact explanations and excuses for its nondisclosure of the REPORT, the REPORT was written to provide information to ATF Supervisors, not argue the government's position in response to a court order. (*See* January 20, 1993 Minute Order.) Since the REPORT was a contemporaneous account which was created in a context free of incentives for inaccuracy or untruthfulness, the court credits the information provided in that government document.

The REPORT makes it clear that the "contact" visits in the U.S. Attorney's Office with women who were said to be the witnesses' common-law wives (H. 243), girlfriends [33] and, as to Evans, his mother,[34] (H. 239)

---

[33] Henry Harris' girlfriend/wife Ola Morris with whom Harris admitted having contact visits (H. 1489–90) fifteen times was the woman with whom Harris had been selling heroin the day he was arrested. (H. 1562.)

[34] Harry Evans' mother would visit him "often" (H. 239) and provided him drugs in the food she brought him in plastic bags during her visits with him in the U.S. Attorney's Office. (H. 3820–23.) Government personnel allowed this to go on unchecked. (H. 4795.)

provided ample opportunity for the transfer of illegal drugs to the government's cooperating inmate witnesses, especially in light of the government's lax security. (H. 212; 4785–86; 4790; 4793–99.) For example, no pat-down search was made of any female visitors' clothing before the "contact" visits unless a female ATF agent was present. (H. 212; 1559–60; 2188.) The presence of female ATF agents was apparently a rare occurrence since neither AUSA Hogan (H. 193–94) nor any other witness at the hearing named any female ATF agent as being present to check the visitors before the "contact" visits. (H. 1545–48.) The REPORT, *supra*, clearly stated *"Wives are not checked* for weapons or contraband prior to witness contact."* (emphasis added.) Furthermore, some of these visits in the U.S. Attorney's Office were behind closed doors. (March 9, 1993 Memorandum of IRS Special Agent Balundis attached to Government's Submission of Additional Evidence filed March 12, 1993.)

The two-page REPORT was clearly known to and in the government's possession during all the "El Rukn" trials and the posttrial hearings. It was not provided to any defense counsel or any court during that period.

(b) *Lax Security Shown By "El Rukn" Witnesses' Undetected Smuggling of Contraband Items from the U.S. Attorney's Office into the MCC*

AUSA Hogan testified at the posttrial hearing that tight security measures were in place when the "El Rukn" inmate witnesses were in the U.S. Attorney's Office. According to Hogan, "the agent was always present . . . never more than steps away. If they spent ten hours in my office, there was an agent sitting at the door." (H. 242.)

This testimony was clearly contradicted by several facts, most telling of which were the circumstances surrounding the government "El Rukn" inmate witnesses' theft, from Hogan's office, of AUSA Hogan's preindictment

prosecution memorandum and other materials relating to the "El Rukn" cases. (*See* Defendants' Exhibit Hunter Confiscation Memo.) (H. 1227; 1743–45; 2331–42.)

In September of 1989, before the October 26, 1989 "El Rukn" indictments were returned by the Grand Jury, the government's "El Rukn" inmate witnesses took these materials from Hogan's office, transported them back to the MCC and disseminated them to other "El Rukn" witnesses.[35] Apparently, no government security personnel saw the government's "El Rukn" witnesses in Hogan's office stealing the prosecution materials. The court must conclude that the witnesses were unguarded at the time, contrary to the testimony of Hogan and "El Rukn" Task Force ATF Special Agents Wolfe and O'Brien. (H. 4554–55; 4786–87.)

Moreover, no one detected the "El Rukn" inmate witnesses smuggling the materials out of the U.S. Attorney's Office, so there must not have been any effective procedure to detect what the "El Rukn" inmate witnesses had received or possessed as they left the U.S. Attorney's Office. Furthermore, no one intercepted the "El Rukn" inmate witnesses when they smuggled the stolen, prosecution materials into the MCC before the indictment was returned. The materials were discovered by Hogan to be missing and were later found in the cells of several "El Rukn" inmate witnesses. (Defendants' Exhibit Hunter Confiscation Memo; H. 1743–45; 2331–42.)

Another instance demonstrating the government's poor security on the "El Rukn" inmate witnesses while outside the MCC, was the smuggling of a contraband substance, referred to as "Ex Lax," from the U.S. Attorney's Office into the MCC on December 10, 1991. Government "El Rukn" witness Ervin Lee was the recipient of the "Ex Lax" contraband substance at the MCC. He told Luchetta on the telephone to hide the substance in Hunter's "legal papers." (Defendants' Exhibit Lee Tape.) Lee later admit-

---

**35.** After the indictment and during the "El Rukn" trials, the government freely allowed the cooperating "El Rukn" witnesses access to trial transcripts and other "legal" materials. Not only did this compromise the independence of the government's "El Rukn" witnesses' testimo-

ny, it provided a further means by which the "El Rukn" inmate witnesses smuggled contraband into the MCC. (Defendants' Exhibit Lee Tape; Lee interview in Government's Submission of Additional Discovery material filed March 12, 1993.)

ted that: "He and other witnesses would get cigarettes [36] into the MCC by that method." (Lee Interview in Government's Submission of Additional Discovery filed March 12, 1993.) This incident clearly illustrated how easily the government's "El Rukn" witnesses could and did transport contraband substances from the U.S. Attorney's Office in the Dirksen Building into the MCC.

Neither of these "smuggling" incidents, which corroborate the defense position that the "El Rukn" witnesses were not only using illegal drugs but were obtaining the drugs while in the U.S. Attorney's Office, were revealed by the government until well into the posttrial hearing before this court. The facts of both situations conclusively proved that the government's "El Rukn" witnesses could smuggle contraband substances and stolen government documents from the U.S. Attorney's Office into the MCC without detection.

### 3. Contact Visits and Lax Security Contributed to Drug Acquisition, Possession and Use

The statement of "John Doe" read at the posttrial hearings, as well as the subsequent FBI interview of "John Doe," provide undisputed direct evidence that Harris and Evans obtained illegal drugs during contact visits at which inadequate security measures were employed. "John Doe," whom the government concedes to be credible, personally witnessed the contact visits and accompanying drug exchanges at the MCC. In his interview with the FBI, Doe said that he learned from Harris, Evans and Hawkins that the cooperating "El Rukn" inmate witnesses were able to obtain drugs from visitors while at the U.S. Attorney's Office. (Transcript of Proceedings of May 14, 1993, pp. 45–46.)

Also, in his interview with the FBI on March 10, 1993, Jackie Clay stated that Harry Evans told him that he could get drugs on either a visit at the MCC or at the U.S. Attorney's Office.[37]

These witnesses' evidence regarding the procurement of drugs through the contact visits merely confirms the inference raised by other known facts. In light of the showing that the witnesses used drugs, that they were permitted to have unsupervised contact visits, and that the security procedures in place were insufficient to stop the transportation of contraband to the MCC, the most obvious conclusion to draw is that the illegal drugs were given to the witnesses during the visits.

### B. Telephone Services for the "El Rukn" Witnesses Through U.S. Attorney's Office

The government also provided its El Rukn inmate witnesses with substantial benefits relating to telephone use. Not only did the witnesses "have unlimited access to telephone service in Task Force office on 39th floor" at 230 S. Dearborn, the Kluczynski Federal Building, as stated in the EL RUKIN GUARD DUTY REPORT, the personnel of the U.S. Attorney's Office provided the government's "El Rukn" cooperating inmate witnesses free access to the U.S. Attorney's telephone lines (H. 3224–25) and free call forwarding services on a regular basis (H. 2526–31), whenever the government's "El Rukn" inmate witnesses were at the MCC. Neither the court nor defense counsel were apprised of these facts.[38]

Under the procedures at the MCC, every phone call made by an inmate from the MCC is a collect call. Therefore, the party receiv-

---

**36.** Hogan also approved furnishing the cigarettes taken to the MCC by the witnesses (H. 2772–73; 2575), which was contrary to U.S. Attorney's Office policy. (Defendants' Exhibit Raphaelson Diary, last page.)

**37.** On April 10, 1989, Harry Evans had a contact visit with his common law wife, Beverly, on the 6th floor of the MCC, and was caught engaging in a sexual act with her. (H. 2192.) Evans tested positive for morphine on April 12, 1989. The proximity in time of the contact visit to the positive drug test indicates that illegal drugs

could have been passed to Evans by Beverly on April 10, 1989, before MCC officials terminated the visit.

**38.** Three months after the conclusion of the posttrial hearings in March of 1993, the government conceded:

> The telephone calls forwarded on behalf of the cooperating witnesses were a benefit and should have been disclosed.

(Government's Brief filed March 22, 1993, p. 22.)

ing and accepting the call must pay the charge. Anytime an "El Rukn" cooperating inmate witness desired to make a phone call from the MCC to anyone anywhere, all he had to do was call a member of the "El Rukn" prosecution team at the U.S. Attorney's Office.

Routinely, the cooperating "El Rukn" inmates' collect calls were accepted and the call was paid for by the government. (H. 3817.) Following that, as part of the routine, if the "El Rukn" witness desired to speak to anyone (even long distance), the call was forwarded or "patched through" by the U.S. Attorney personnel to whomever the "El Rukn" cooperating inmate witness desired, again at government expense. This was done "numerous times" for the "El Rukn" inmate witnesses. (H. 2343.) (*See e.g.*, Defendants' Exhibit Hunter Tape.)

U.S. Attorney's Office personnel in this case provided this benefit upon the request of the government's "El Rukn" inmate witnesses several times a week for years. This was a service not available to other inmates housed at the MCC. Moreover, it was not a service provided by all the Assistant U.S. Attorneys who prosecuted "El Rukn" cases. For example, AUSA John Podliska, an experienced prosecutor, who was one of AUSA Hogan's predecessors on the "El Rukn" investigation (H. 65–66), and who tried the 1987 case in which El Rukn leader Jeff Fort and other El Rukn members were convicted, *United States v. Jeff Fort, et al.*, 86 CR 572 (N.D.Ill.), never provided such benefits to any witness. (H. 3348.)

The evidence of the telephone privileges is especially troubling when viewed together with the proof of the government's "El Rukn" inmate witnesses' drug use. In light of the evidence indicating that the witnesses received drugs from outside sources, the court can only infer that the "El Rukn" cooperating inmate witnesses utilized their telephone privileges to contact their illegal drug suppliers at taxpayer expense. An example of this type of occurrence appears in a January 28, 1992 telephone call from the MCC in which Harry Evans complained about the poor quality of the cocaine he had recently received. (*See* Government's Filing of February 19, 1993.)

### C. *AUSA Hogan's Intercession With MCC Officials for the El Rukn Witnesses*

AUSA Hogan interceded with the MCC numerous times on behalf of the government's cooperating inmate witnesses on a variety of topics dealing with the inmates' comfort and "everyday occurrences at the MCC." (H. 428.) The witnesses knew they could call AUSA Hogan "and complain about certain things at the MCC" (H. 264; 352–56), and Hogan would talk to MCC personnel on the witnesses' behalf. *Id.* Hogan interceded for the "El Rukn" witnesses on such things as their food, their phone calls, their recreation time, their showers and their job assignments. (H. 428.)

"John Doe" was told by Hunter, Harris and other cooperating government witnesses that AUSA Hogan had made efforts to intercede with the Warden of the MCC, at the request of the government witnesses, on topics involving the quality of food and other jail amenities. The cooperating witnesses stated that the Warden of the MCC was irritated by the efforts of AUSA Hogan to intercede on such topics, and that Hogan thereafter declined to contact the Warden at the request of the cooperating witnesses.[39] (H. 4709–10.)

---

**39.** "John Doe's" *Brady* information was not fully disclosed at the post-trial hearing. For example, the government's admission did not name the "other cooperating government witness in possession of powdered substances which [Doe] believed to be drugs." Following the post-trial hearing, the government did not seek to obtain this or any other further information from "Doe" regarding drug use by the government's "El Rukn" inmate witnesses at the MCC. The court ordered this be done and the government initially refused. (Government's Filing of April 14, 1993.) Because the government had not revealed "John Doe's" true identity, defense counsel could not interview him to obtain the further details. (Transcript of Proceedings, April 16, 1993.) On April 30, 1993 Acting U.S. Attorney Smietanka explained the error of the refusal. (Transcript of Proceedings, April 30, 1993.) "John Doe" was interviewed on May 3, 1993 and provided further details of the drug use stating that "El Rukn" witnesses Derrick Kees, Earl Hawkins, and Jackie Clay also used illegal drugs. (Transcript of Proceedings, May 14, 1993, p. 46.)

AUSA Hogan knew several MCC personnel he could and did contact on behalf of the "El Rukn" inmate witnesses. For example, Hogan telephoned Hafer and complained about Harris' June 27, 1991 disciplinary hearing. (H. 4828–30.) According to Harris, he never served the sanction imposed by the disciplinary officer at the June 27, 1991 disciplinary hearing. Harris testified that a few days after the hearing (presumably also after Hogan's phone call) "Mr. Hafer said he would remove all disciplinary reports" [and] "that he would remove any disciplinary forms that would hinder me at parol time from making parol."[40] (H. 1528–29.)

The assistance which AUSA Hogan provided for the El Rukn witnesses is significant for a number of reasons. As an initial matter, Hogan's interventions on behalf of the witnesses constituted benefits conferred which were not disclosed to the defense. Secondly, Hogan's attempts to influence officials at the MCC had the effect of loosening discipline and therefore contributed to the permissive atmosphere which facilitated the illegal drug use of the "El Rukn" inmate witnesses.

Finally, the evidence establishes Hogan's concern and involvement with the day-to-day aspects of the witnesses' lives and demonstrates that an open and readily used channel of communication existed between Hogan and the cooperating inmate witnesses. These facts undermine Hogan's repeated assertions that he was oblivious to the witnesses' improper activity or the disciplinary proceedings that resulted from their drug use.

### D. Other Undisclosed "Benefits"

The posttrial hearings revealed, for the first time several other undisclosed benefits received by the government's "El Rukn" witnesses from the U.S. Attorney's Office personnel. The totality of benefits reflect the extraordinary effort of the government personnel to maintain the "good will" of the "El Rukn" witnesses.

### 1. Sundry Items Provided to the Witnesses

The United States Attorney's Office personnel and ATF personnel on the "El Rukn" case provided the government cooperating witnesses sundry items such as cigarettes (H. 1926; 4795) as the "El Rukn" witnesses desired. Harris and Lee were also given beer.[41] (Defense Exhibit Hunter Transcript, p. 49; Government's Filing of February 19, 1993, attachment pp. 2 and 8.) Harris' beer was provided him by U.S. Attorney paralegal Luchetta while the "El Rukn" prosecution team was celebrating the convictions obtained in the "El Rukn" trial before Judge Mills. (Defendants' Exhibit Hunter Tape; Transcript, p. 49.) This "benefit" of providing beer to the "El Rukn" inmates is illegal,[42] and was not revealed to the defense until this court, in December 1992, ordered the disclosure of the December 17, 1991 tape-recorded conversation between Luchetta and "El Rukn" inmate Hunter. *Id.*

Additionally, the government provided its "El Rukn" witnesses several hundred dollars in clothing, cash, gifts and other items, such as a camera and "Walkman" radios,[43] which had been obtained by government personnel at the request of the "El Rukn" witnesses or given to them at government expense. These items, though known by the government at the time of the *Burnside* trial and at the time of the 1992 posttrial hearings, were only revealed for the first time three months after this court's posttrial hearings ended. (*See* Government's Additional Discovery filed

---

**40.** This promise to Harris by the MCC's Executive Assistant Hafer was a promised benefit to Harris which was never disclosed by the government before or during the *Burnside* trial.

**41.** In the interview given by Eugene Hunter to the FBI on March 19, 1993, Hunter also told the FBI that the agents guarding him occasionally leave a beer on a desk in government offices for him to drink. (*See* FBI Interview of Hunter dated March 19, 1993, pp. 7–8.)

**42.** Providing "an alcoholic beverage" to an inmate is a criminal violation of 18 U.S.C. § 1791(a) as defined in 18 U.S.C. § 1791(d)(1)(D) and is punishable by a prison term of up to one year pursuant to 18 U.S.C. § 1791(b)(4).

**43.** "Walkman" radios were used by Harris and Evans to conceal their illegal drugs when passing them to one another. (H. 2808.)

March 12, 1993 and Government's Submission of Additional Discovery filed March 31, 1993.) (H. 3847.)

### 2. *U.S. Attorney's Office Paralegal Corinda Luchetta*

Certain special benefits were also conferred on certain "El Rukn" cooperating inmate witnesses through the improper conduct of U.S. Attorney's Office paralegal Corinda Luchetta. During a December 17, 1991 phone conversation Ms. Luchetta had with inmate witness Eugene Hunter, which was tape recorded pursuant to the routine procedures of the MCC, Luchetta willingly engaged in an intimate, sexually explicit conversation with Hunter. In the conversation, Luchetta gave descriptions of sexual fantasies at Hunter's request. Hunter reciprocated. The two of them discussed various other personal subjects. (Defendants' Exhibit Hunter Tape; H. 2554–2557.) The taped phone conversation demonstrates that Ms. Luchetta's relationship with witness Hunter was inconsistent with the type of professional detachment expected of any personnel in a U.S. Attorney's Office. (H. 1875; 2334.)

The tape recording of a phone call that took place on December 10, 1991 (Defendants' Exhibit Lee Tape) provides additional evidence of further improper conduct by paralegal Luchetta and benefits provided to another "El Rukn" inmate witness, Ervin Lee. The December 10, 1991 phone call, which occurred one week before the taped conversation with Hunter, shows that Luchetta, at the request of Lee, provided a contraband which Luchetta and Lee referred to as "Ex–Lax" to government inmate witness Hunter. He smuggled the "Ex–Lax" into the MCC hidden in "legal papers" also provided by Luchetta. (*See* Defendants' Exhibit Lee Tape.) [44]

This conduct by Luchetta, which was not revealed until the posttrial hearing, is relevant to the issues before the court for a number of reasons. Ms. Luchetta's sexual banter with Mr. Hunter, her improper act of providing "an alcohol beverage" to an inmate in apparent violation of 18 U.S.C. § 1791, and her improper act of providing the contraband to an inmate also in apparent violation of 18 U.S.C. § 1791, were instances of more benefits provided to the "El Rukn" cooperating witnesses. (H. 3825–30.) Moreover, evidence exists that the benefit of providing the contraband "Ex–Lax" conferred by Luchetta may have facilitated the "El Rukn" witnesses' illegal drug use. The May 3, 1993 FBI interview of "John Doe," indicates that the "El Rukn" inmate witnesses' use of the laxative Ex–Lax related to their illegal drug use. According to "John Doe":

> Females [visitors to the MCC] [would] provide Harris and Evans drugs in condoms and balloons. These individuals would immediately swallow the condoms or balloons then request "Ex Lax" in order to quickly pass the condoms and/or balloons.

(Transcript of Proceedings of May 14, 1993, p. 45.)

When the upper-level supervisors in the United States Attorney's Office, including then United States Attorney Foreman, learned of the taped phone conversations in December 1991, they took no meaningful action and imposed no meaningful discipline. Although paralegal Luchetta was threatened with termination, she was not discharged, suspended, demoted or even transferred to another assignment. She remained active on the "El Rukn" cases up to the time she asserted her Fifth Amendment rights at the posttrial hearings in December 1992.

Moreover, no serious investigation into other possible misconduct by Luchetta was made.[45] After paralegal Luchetta's inappro-

**44.** The post-hearing evidence revealed that on November 6, 1991 Lee also requested "Ex Lax" in a phone call to a female at the U.S. Attorney's Office. (*See e.g.,* Government's Response to Court's Order dated February 3, 1993, pp. 3–4.)

**45.** Evidence exists that the conduct revealed by the two December 1991 tape-recorded phone calls did not constitute the full extent of Ms. Luchetta's misconduct. After Luchetta heard

that a call with Hunter had been recorded, but before she learned which call it was, Ms. Luchetta confided to Tanya Van Blake "that there was more than one conversation, and she [Luchetta] was concerned as to which one it was." (H. 3825–26.) Additionally, witness Hunter told the FBI that "there could have been other conversations [with Luchetta] on the phone of a sexual nature other than the one which he knows was

priate conduct became known to the officials in the U.S. Attorney's office, including then U.S. Attorney Foreman, Ms. Luchetta received two "merit" salary increases within the U.S. Attorney's Office totalling several thousand dollars. She was also given travel authorization and reimbursed expenses in October 1992 to visit and confer with Henry Harris at his place of confinement just before the posttrial hearings were to begin. (H. 3958–60.)

Moreover, contrary to Department of Justice policy set forth in the United States Attorney's Manual, then U.S. Attorney Foreman provided no notification to the Office of Professional Responsibility of the Department of Justice of Luchetta's misconduct.[46] Providing the only explanation offered at the posttrial hearing as to the U.S. Attorney's Office's inadequate response to the incidents involving paralegal Luchetta's conduct, executive AUSA Nancy Needles testified that the failure to discipline or discharge paralegal Luchetta occurred "because we all did a terrible job in following up." (H. 4495.)

### DISCUSSION AND APPLICATION OF THE LAW

### I. UNITED STATES ATTORNEY'S RESPONSIBILITY TO JUSTICE

More than fifty years ago the United States Supreme Court articulated the responsibility each United States Attorney has to the system of justice in this country:

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). Adherence to this standard by United States Attorneys is essential to the proper administration of justice.[47] When prosecutors fail to fulfill their obligations under the law, justice suffers:

At the time government counsel made the pretrial representations, quoted at pp. 1222–1223, *supra,* that they would "honor" their obligations under *Brady* and *Giglio,* govern-

---

recorded. There were conversations face to face over the table between he and Corinda Luchetta which were of a sexual nature." (FBI Interview of Hunter dated March 19, 1993.)

**46.** Section 1–4.100 of the United States Attorney's Manual entitled "NOTIFICATION OF MISCONDUCT BY EMPLOYEES OF THE DEPARTMENT OF JUSTICE" states:
It is the responsibility of the U.S. Attorney to:
A. Notify promptly the Counsel, Office of Professional Responsibility, of any allegation made against a Department employee involving any violation of law, Department order or regulation, or applicable standard of conduct, mismanagement, gross waste of funds, abuse of authority, or acts of reprisal against "whistleblowers;"
B. Take no further action on any allegation except to render such assistance as the Counsel, Office of Professional Responsibility may request; and
C. Remind employees in writing at least twice a year of the existence of the Office of

Professional Responsibility; of their right to bring allegations of misconduct directly to the attention of the Office of Professional Responsibility; and of their obligation to cooperate fully with any investigation that Office may initiate.
Allegations against employees of the U.S. Attorney's Office should also be reported to the Executive Office for the U.S. Attorneys.

**47.** Toward that end in 1971 the American Bar Association drafted standards for prosecutors and defense counsel which included the following commentary:

although the prosecutor operates within the adversary system, it is fundamental that his obligation is to protect the innocent as well as to convict the guilty, to guard the rights of the accused as well as to enforce the rights of the public.
*ABA Standards Relating to the Prosecution Function and the Defense Function,* § 31.1 (1971) (commentary at 44.)

ment counsel knew that Evans and Harris had used illegal drugs. Government counsel concealed that information and allowed the drug use to continue unchecked. Government counsel also concealed the various benefits the government provided its cooperating "El Rukn" inmate witnesses. All of this information should have been disclosed to defendants' counsel before the *Burnside* trial.

■ Government counsel's conduct fell below that required by the prosecutorial standards articulated by the Supreme Court in *Berger*, as well as the standards promulgated by the American Bar Association and the United States Department of Justice.[48] Improper prosecutorial conduct such as shown in this case should not be condoned or tolerated. Under the law, these prosecutorial improprieties, however, do not require a new trial or other sanctions unless the improper prosecutorial acts resulted in a constitutional deprivation of the criminal defendants' due process rights. *See United States v. Hasting*, 461 U.S. 499, 505–10, 103 S.Ct. 1974, 1978–81, 76 L.Ed.2d 96 (1983).

## II. *SUPREME COURT'S ARTICULATION OF THE GOVERNMENT'S CONSTITUTIONAL OBLIGATIONS*

■ Thirty years ago, the Supreme Court held in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) that due process requires the prosecution to provide the defense upon request any evidence favorable to the accused which is material either to guilt or to punishment. *Id.* at 88, 83 S.Ct. at 1197. Over twenty years ago, in *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Supreme Court held that the government's *Brady* obligation to provide evidence to the defense encompasses evidence affecting a government witness' credibility. 405 U.S. at 154.

The Supreme Court in *Giglio* also stated that the *Brady* obligation extended beyond the mere knowledge of the trial prosecutor. *Id.* In *Giglio*, a prosecutor, other than the one who tried the case, had made a promise of immunity to the key government witness. The promise of immunity was not disclosed to Giglio's counsel and Giglio was convicted. The Supreme Court reversed the conviction.

■ In its opinion in *Giglio*, the Supreme Court explicitly imposed upon the government the obligation to disclose impeaching information of which government personnel are aware, even though the information is not known to the prosecutors personally involved in the trial of the case. The Supreme Court commented:

> To the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it.

405 U.S. at 154, 92 S.Ct. at 766. Consequently, for over twenty years the prosecutors in large U.S. Attorney's Offices, such as the one here in Chicago, have had the responsibility to establish and implement appropriate "procedures and regulations" to ensure that the *Giglio* mandate is fulfilled in every case.

. Eight years ago in *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Supreme Court reaffirmed that the prosecutorial duty of disclosure under *Brady* included the duty to disclose impeaching evidence, which in *Bagley* were contractual agreements signed by the government's principal witnesses stating that the Government would pay money to the witness commensurate with the information furnished during an undercover operation. *Id.* at 671, 105 S.Ct. at 3378.

■ The Supreme Court in *Bagley* rejected the Court of Appeal's determination that

---

48. The basic policy of the Department of Justice as to the standard of conduct of U.S. Attorney's Office personnel as set forth in Section 45.735-2 of the United States Attorney's Manual is as follows:

Employees shall ... conduct themselves in a manner that creates and maintains respect for the Department of Justice and the U.S. Government. In all their activities, personal and official, they should always be mindful of the high standards of behavior expected of them....

the government's failure to disclose the *Brady* information required automatic reversal. *Id.* at 674, 105 S.Ct. at 3379. The Supreme Court went on to articulate the single standard for the determination whether the withheld evidence which should have been disclosed to the defense under *Brady* or *Giglio* was material and, therefore, required a new trial. The Supreme Court in *Bagley* stated:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.... A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Id.* at 682, 105 S.Ct. at 3383 (citation omitted).

In *Bagley,* the Supreme Court quoted *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935) regarding the prosecutorial duty to make disclosures pursuant to *Brady* and stated that "the prosecutor's role transcends that of an adversary." 473 U.S. at 676 n. 6, 105 S.Ct. at 3380 n. 6. Consequently, the law is clear that the failure of any U.S. Attorney or any Assistant U.S. Attorney to abide by the standards of conduct expected pursuant to the Supreme Court's opinion in *Berger* for the disclosure of material under the constitutional doctrine articulated in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny can, if warranted by the factual circumstances, rise to the level of a constitutional due process violation.

III. *PROOF OF A CONSTITUTIONAL VIOLATION*

■ The rule compelling government disclosure discussed by the Supreme Court in the *Brady, Giglio* and *Bagley* opinions is based upon the constitutional doctrine requiring due process of law in the administration of criminal justice. To prove a constitutional due process violation resulting from the government's failure to make a proper disclosure under *Brady,* a defendant must establish three elements: (1) that the prosecution suppressed the evidence; (2) that such evidence was favorable to the defense; and

(3) that the suppressed evidence was material. *See, Moore v. Illinois,* 408 U.S. 786, 794–95, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); *United States v. Jackson,* 780 F.2d 1305, 1308 (7th Cir.1986). The court will address each of these requisite elements individually and the evidence in this case applicable thereto.

A. *The Prosecution Suppressed the Evidence*

Information of the government's cooperating "El Rukn" inmate witnesses' continuing drug use and their receipt of government supplied benefits first became known to defense counsel at the posttrial hearings. This impeaching evidence was not disclosed before or during the *Burnside* trial.

■ The government's failure to disclose this impeaching evidence, however, does not end the inquiry. The fact that *Brady* material was not disclosed by the government does not automatically mean it was "suppressed" by the government. As the government points out, if the government had no knowledge of undisclosed *Brady* material at the time of a defendant's trial, then the government could not be held to have suppressed that *Brady* material. *See e.g., United States v. Lockhart,* 956 F.2d 1418, 1425 (7th Cir.1992). The posttrial evidence shows, however, that the government personnel had knowledge of the impeaching evidence at the time of the *Burnside* trial.

1. *Government Personnel had Knowledge of the Undisclosed Brady Material*

The government in its posttrial Brief in Opposition to Defendants' Motion for a New Trial contends that the members of the "prosecution team" were unaware of the undisclosed *Brady* material. This argument is set forth as the government's primary argument in the first paragraph of the "Introduction" section on the first page of the "Government's Brief in Opposition to Defendants' Motion for New Trial" filed March 22, 1993. It is quoted below [49] and is both factually and legally erroneous.

---

**49.** That argument in the Government's Brief in Opposition, p. 1., states:

The posttrial evidence established that a substantial amount of *Brady* material, which was not disclosed before or during the *Burnside* trial, was known personally to the trial prosecutor, AUSA William Hogan. Further, the same and other *Brady* information was known to other U.S. Attorney's Office personnel. Additionally, *Brady* information was also known to the ATF case agents, the Chicago police officers working on the case, the MCC's Warden, and other government personnel who were involved with the "El Rukn" cases as a result of their responsibilities in dealing with the government's cooperating "El Rukn" inmate witnesses.

The knowledge of these government employees, as well as knowledge of facts that were readily available to government personnel, is imputed to the government under the law. Further, facts government personnel would have discovered had they pursued a rudimentary investigation are also considered known to the government for purposes of *Brady*. Also known to the government were facts constituting the "tip of the iceberg" of *Brady* information which might have been discovered by the defense if the facts concealed by the government had been disclosed. The legal authority which forms the basis of the court's conclusions on these subjects is discussed below.

(a) *AUSA Hogan had Personal Knowledge of the Undisclosed Brady Material*

■ It is beyond dispute that facts known to the lead prosecutor in a trial are "known" to the government for purposes of *Brady*. As previously discussed, the evidence presented posttrial shows that AUSA William Hogan, lead prosecutor in the *Burnside* trial, had personal knowledge of the facts that cooperating government witnesses were us-

ing illegal drugs, and did not disclose those facts to the defense.

AUSA Hogan twice received documentation of the 1989 positive drug test results showing Harris' and Evans' illegal drug use—once in 1989 (Defendants' Exhibit Rosenthal Memorandum) and once in 1991 (Defendants' Exhibit Mildner Memorandum). He disclosed neither of the two memoranda nor any of the information they contained to the *Burnside* defense counsel.

Further, AUSA Hogan discussed the 1989 drug tests with then AUSA Rosenthal. Also, AUSA Hogan was told by his superior AUSA Ira Raphaelson about the MCC's Warden's "concerns of contraband coming to the El Rukns." (H. 1231–32.) Additionally, the posttrial evidence showed that AUSA Hogan was told multiple times by government cooperating "El Rukn" inmate witnesses Jackie Clay and perhaps other witnesses [50] of Harris' and Evans' illegal drug use. Hogan was also told by the ATF case agents there were "rumors" of the "El Rukn" inmate witnesses' illegal drug use.

The evidence presented posttrial points to the fact that AUSA Hogan knew of the government's witnesses' continuing, illegal drug use at the time of the *Burnside* trial and before. The government's Brief in Opposition, however, ignores these facts which establish Hogan's personal knowledge of the continuing, illegal drug use by the government's "El Rukn" inmate witnesses.

Additionally, AUSA Hogan was aware of the substantial, undisclosed benefits provided to the government's witnesses and failed to disclose that information as well. Hogan personally interceded on the witnesses' behalf with MCC officials. He personally allowed the "El Rukn" witnesses access to

Defendants' shotgun blast of allegations misses the mark. Most of their claims under *Brady v. Maryland*, 373 U.S. 83, [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963), fall short because the members of the "prosecution team," namely, U.S. Attorney's Office personnel and the investigating agents, were unaware of the allegedly favorable information before or during the trial.

**50.** The post-hearing evidence suggests Hogan heard of the illegal drug use from other sources as well. For example, Harry Martin testified

before Judge Aspen on May 24, 1993 that he discussed the illegal drug use with Hogan in the fall of 1991. Martin, however, did not disclose this during his testimony of December 30, 1992 at the post-trial hearing before this court. Additionally, Eugene Hunter told the FBI that he "gave his opinion to Bill Hogan that he thought Evans was using drugs." (FBI Interview of Hunter, March 19, 1993.) During his post-trial hearing testimony before this court, however, Hunter did not testify to telling Hogan of the drug use.

government telephone phone lines. He personally allowed the witnesses to use offices under his control for contact and conjugal visits. Further, he allowed the "El Rukn" witnesses to continue their illegal drug use after he became personally aware of it. All of this information was known to the government for purposes of *Brady* and was not disclosed to the defense in the *Burnside* trial.

(b) *Other U.S. Attorney's Office Personnel had Knowledge of Undisclosed Brady Material*

█ Even if AUSA Hogan had not been as aware of the undisclosed *Brady* material as the posttrial evidence proves he was, the fact that other U.S. Attorney's Office personnel were aware of the *Brady* material makes knowledge of the *Brady* material attributable to the government under the precise holding in *Giglio*. In *Giglio*, the Supreme Court stated that ignorance by the trial prosecutor does not excuse a *Brady* violation if the *Brady* material is known to others in a U.S. Attorney's Office. *Giglio*, 405 U.S. at 154, 92 S.Ct. at 766.

The application of this well-established principle of the *Giglio* decision means that knowledge of the October 18, 1989 memorandum of Harris' and Evans' positive drug tests (Defendants' Exhibit Rosenthal Memorandum), which the U.S. Attorney's Office received, is imputed to the government for purposes of *Brady*. Additionally, the knowledge of First Assistant Raphaelson of the drug problems on the sixth floor of the MCC was known by the government. Further, knowledge of U.S. Attorney's Office paralegals Luchetta and Van Blake is imputed to the government. This includes Luchetta's knowledge of Harris' refusal to take a drug test on May 30, 1991, her knowledge of the benefits which she provided to the "El Rukn" inmate witnesses, and Van Blake's knowledge of Henry Harris' admission of his illegal drug use.

Under the *Giglio* decision, knowledge of any benefits which any U.S. Attorney's Office personnel provided to the "El Rukn" witnesses, such as the telephone services or the sundry items and gifts, is also imputed to the government for purposes of *Brady*, because of the obligation the Supreme Court established in *Giglio* on U.S. Attorney's Offices "to insure communication of all relevant information on each case to every lawyer who deals with it." 405 U.S. at 154, 92 S.Ct. at 766.

(c) *Other Government Personnel Had Knowledge of Undisclosed Brady Material*

█ In addition, even if none of the personnel in the U.S. Attorney's Office had been as aware, as they were, of the undisclosed *Brady* material, the fact that the ATF agents and the Chicago police officers who were part of the "El Rukn" task force working on the "El Rukn" cases were aware of the *Brady* material makes knowledge of the *Brady* material attributable to the government for *Brady* purposes.

This conclusion is supported by the Seventh Circuit's decision in *United States ex rel. Smith v. Fairman*, 769 F.2d 386 (7th Cir.1985). In *Smith*, the Seventh Circuit affirmed the district court's decision granting a habeas corpus petition. The Seventh Circuit held that a state prosecutor's ignorance of the withheld *Brady* material did not justify the nondisclosure of the *Brady* material which had been known to a police ballistics expert, but which was not included in the official report the expert prepared and provided to the prosecutor. The Seventh Circuit stated:

> We believe that the purposes of *Brady* would not be served by allowing material exculpatory evidence to be withheld simply because the police, rather than the prosecutors, are responsible for the nondisclosure. *See Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir.1984) ("a prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or compartmentalizing information about different aspects of a case.")

*Id.* at 391–92.

In this case, "El Rukn" task force agents working with the prosecutors permitted the "El Rukn" cooperating witnesses to have contact visits with visitors at government offices. These same agents employed the lax security procedures which allowed the passing of contraband to the government's witnesses to occur. The application of the prin-

ciple articulated by the Seventh Circuit in *Smith* means that knowledge of the contact visits and lax security arrangements, which were permitted by "El Rukn" task force personnel who were working with the prosecutors in this case, is imputed to the government for purposes of *Brady*.

(d) *Brady Evidence was "Readily Available" to the Prosecution Which Imputes Knowledge for Brady Purposes*

 In the case at bar, even if none of the U.S. Attorney's personnel nor the federal agents nor the police officers had been as aware of the undisclosed *Brady* material as they were, knowledge of the information would still be attributed to the government for *Brady* purposes since much of the undisclosed *Brady* material was possessed by the Warden and other personnel in the MCC [51] in Chicago and was "readily available" to the U.S. Attorney's Office for the asking. · *See e.g. United States v. Perdomo*, 929 F.2d 967, 970–71 (3rd Cir.1991) (U.S. Attorney's failure to disclose federal government's witness' state criminal record was held to be a *Brady* violation even though the information was not possessed by the U.S. Attorney because the information was "readily available" to the U.S. Attorney's Office from local authorities).

In *United States v. Deutsch*, 475 F.2d 55 (5th Cir.1973), the U.S. Attorney's failure to provide a personnel file of a U.S. Post Office employee who was a key prosecution witness in an attempted bribery case was held to be a *Brady* violation. The Fifth Circuit stated:

[T]here is no suggestion in *Brady* that different "arms" of the government, particularly when so closely connected as this one for the purpose of the case, are severable entities. And, of course, the *Brady* rule requires the government to supply evidence useful to the defendant simply for impeachment purposes. *Giglio v. United*

*States,* 1972, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104.

*Id.* at 57 (footnote omitted).

Several Bureau of Prisons' records showing that Harris' and Evans' positive drug tests were not authorized, such as the MCC Urine Surveillance Log and related documents, were readily available to the U.S. Attorney's Office, as were the disciplinary records showing that Harris had admitted his illegal drug use. The disciplinary records regarding Harris' refusal to take a drug test on May 30, 1991 during the *Bingham* and *Boyd* trials were likewise readily available to the U.S. Attorney's Office personnel who had knowledge of the events but who neither investigated nor disclosed the information.

(e) *Government Required By Brady to Inquire Further Into Facts*

 *Brady* does not require the government to make its files available for review based upon the defense's speculation that the files may contain evidence favorable to the defense. *See e.g., United States v. Pou,* 953 F.2d 363, 365–67 (8th Cir.1992); *United States v. Davis,* 752 F.2d 963, 976 (5th Cir. 1985). Yet, under the circumstances of this case, where the facts which were known by the prosecution should have prompted further investigation, *Brady* mandates the inquiry. If government prosecutors, who are in the best position to know and learn the true facts, can merely look the other way and ignore known facts rather than conduct an examination which is warranted by those known facts, fundamental fairness and due process are easily dashed.

i. *Brady requires inquiry*

In *United States v. Brooks,* 966 F.2d 1500 (D.C.Cir.1992), the United States Court of Appeals for the District of Columbia discussed what it determined to be the underlying reasoning of the decisions by the Third, Fifth and Seventh Circuits which found *Bra-*

---

**51.** The U.S. Attorney's Office in Chicago worked closely and communicated freely with the Warden of the MCC and other MCC personnel about the "El Rukn" witness inmates who were housed at the MCC. Also, the U.S. Attorney's Office has for several years had an assigned liaison AUSA (H. 1089) whose job was and is to communicate with the MCC's Warden as to issues relating to MCC security, and whether contraband was coming into the MCC, "contraband being defined as cigarettes at one of the extreme and narcotics and weapons at the other end of the extreme." (H. 1089–90.)

*dy* violations to have resulted from a prosecutor's unknowing failure to disclose information possessed by other governmental entities, and stated:

> We suspect the courts' willingness to insist on an *affirmative duty of inquiry* may stem primarily from a sense that an inaccurate conviction based on government failure to turn over an easily turned rock is essentially as offensive as one based on government non-disclosure.

*Id.* at 1503 (emphasis added).

In the *Brooks* case, defendant Brooks had been convicted by a jury on various drug charges in Washington, D.C. The D.C. trial judge thereafter granted a new trial. After the first trial, but before the second, the government's chief witness against Brooks, D.C. police officer Christie Hoyle, was fatally shot with her own service revolver in the apartment of fellow D.C. police officer David Rowland. He was later charged with Hoyle's death after the second *Brooks* trial. 966 F.2d at 1501–02.

Before the second *Brooks* trial, Brooks' lawyer sought to secure or have the court examine, any D.C. police department files relating to officer Hoyle and the circumstances of her death. At the second trial, the trial judge reviewed *in camera* Hoyle's police department personnel file and found no *Brady* material. The prosecution did not furnish any other police files relating to Hoyle's death, such as any homicide investigation file or police "Internal Affairs Division" file. The trial prosecutor, in opposing the defense request, mischaracterized the record, contending, in essence, that such files did not exist. *Id.* The transcript of the testimony Hoyle had provided at the first *Brooks* trial was admitted in evidence pursuant to Federal Rule of Evidence 804(b)(1) at the second trial. Brooks was again convicted.

On appeal from Brooks' second trial, the Court of Appeals for the D.C. Circuit remanded the case stating:

> On remand, the district court should require the U.S. Attorney's Office to do what it should have done earlier: to review (or have a suitably responsible person in the Metropolitan Police Department review) any homicide and any Internal Affairs Division files of the [Police] Department that may contain material exculpatory information (undermining the credibility of Hoyle either as a general matter or with special reference to this case).

966 F.2d at 1504.

The D.C. Circuit, in concluding that a duty to search the undisclosed police department files existed under the *Brady* doctrine, noted:

> In extending the *Brady* duty to searches for evidence, the 5th Circuit framed the matter as one of incentives for the government, arguing that without the extension "we would be inviting and placing a premium on conduct unworthy of representatives of the United States Government." *United States v. Auten*, 632 F.2d 478, 481 (5th Cir.1980). The 7th Circuit has sounded a similar note, warning that "a prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or compartmentalizing information about different aspects of a case." *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir.1984). The 3rd Circuit, while following the 5th Circuit's *Auten* decision, did not refer to incentives directly, although its observation that the U.S. Attorney's failure to check an obvious database for a key witness's criminal conviction "amounted to conduct unworthy of the United States Attorney's Office", *United States v. Perdomo*, 929 F.2d 967, 970–71 (3rd Cir.1991), may rest on the same judgment.

966 F.2d at 1502.

"Keeping itself in ignorance," *Carey*, 738 F.2d at 878, failing "to turn over an easily turned rock," *Brooks*, 966 F.2d at 1503, and engaging in "conduct unworthy of the U.S. Attorney's Office," *Perdomo*, 929 F.2d at 971, is precisely what the government counsel has done here. Rather than aggressively investigate the multiple indications of illegal drug use they had received, government chose to conceal and ignore the information and, worse yet, to continue to allow practices which facilitated its witnesses' illegal conduct.

The government could have, and under MCC policy should have, continued drug

testing for an extended period after Harris' and Evans' positive drug tests in the Spring of 1989. The government did not take this step, but rather ended drug testing after a few months. The government could have insisted on testing Henry Harris after he refused the drug test on May 30, 1991. The government could have tested Harry Evans when prosecutors remarked that he appeared as if he were on drugs. Upon hearing reports of drug use by the cooperating "El Rukn" inmate witnesses, the government could have investigated by interviewing people who were cooperating government witnesses in other cases who were also living on the MCC's sixth floor. At the very least, the government, knowing that its inmate witnesses had received and ingested illegal drugs while incarcerated, could have implemented security procedures which would have prevented, impeded or detected its witnesses' receipt of illegal drugs. The government, however, took none of these steps, any one of which would have led to the further discovery of *Brady* information.

### ii. *The government cannot assert the "ostrich" defense*

█ Allowing the government to absolve itself on the basis of its counsel's asserted ignorance of the facts—ignorance prompted by the government lawyers closing their eyes to facts which should have prompted them to investigate—would be akin to allowing criminal defendants to avoid guilty knowledge by means of the "ostrich" defense. Time and time again the government has argued, and the Seventh Circuit has concurred, that when such an "ostrich" defense is presented to a jury, the following language is appropriate to augment the standard "knowledge" jury instruction:

You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed, or that someone had withheld some important fact, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly, as I have used the word.

*United States v. Stone,* 987 F.2d 469, 470–71 (7th Cir.1993); *United States v. Caliendo,* 910 F.2d 429, 433–34 (7th Cir.1990). The same principle applies here to the government counsel's conduct, which is subject to a higher standard than that applicable to a criminal defendant.

The government's post-hearing Brief in Opposition ignores the facts which, the government concedes, were known by its personnel at the time of the *Burnside* trial, including: (1) the positive drug test results; (2) the discussions between the MCC's Warden and the First AUSA; (3) the drug test refusal by Harris; (4) the "rumors" of the witnesses' drug usage; and (5) the admitted, undisclosed government-bestowed benefits, among others. Although the government personnel were proven by the post-trial evidence to know additional facts beyond those conceded by the government, the conceded facts alone should have prompted further governmental investigation. They did not, and the government's post-trial arguments echo the "ostrich" theme by ignoring any duty to investigate prompted by the known facts.

The thrust of the government's arguments are that *Brady*'s reach is limited to that evidence which falls in the lap of "the prosecution team" through no effort or inquiry on the part of any prosecutorial personnel. The government contends:

*Brady,* however, applies only to evidence possessed by "the prosecution team," namely, the prosecutors, other prosecutorial personnel, and investigative agencies over which the prosecutor has authority in a given case. It does not reach information possessed by government agencies that did not participate in the investigation, or by cooperating witnesses. Under *Brady,* then, the prosecution could not and did not suppress information that was possessed only by BOP, WITSEC or cooperating witnesses.

(Government's Brief in Opposition filed March 22, 1993, p. 2., footnote omitted.)

The government's Brief, in essence, claims that "the 'El Rukn' prosecution team" members had no duty to communicate with the personnel of any other federal agencies, such as the MCC's Warden or the WITSEC Mar-

shals, with whom the government prosecutors worked closely on a continuing basis and had authority over as related to obtaining information for court. *See United States v. Spagnoulo,* 960 F.2d 990, 993–94 (11th Cir. 1992.) The government's position that government personnel have no duty to inquire, no matter how much the known facts compel the inquiry, is inconsistent with the *Brady* doctrine which requires the government to provide due process. *See United States v. Perdomo,* 929 F.2d 967, 971–72 (3rd Cir. 1991).

### iii. The "prosecution team" concept does not relieve the government's duty to disclose under Brady

■ The government argues that "the prosecution team" concept justifies its position that the *Brady* material need not have been disclosed. This contention lacks merit. First, as has been previously discussed, government personnel who were members of the "prosecution team" possessed and failed to disclose evidence which was favorable to the defense. Further, the concept that the *Brady* obligation encompassed the entire "prosecution team" was not enunciated as a means by which the government could narrow its *Brady* obligations. The concept was created as a judicial response to erroneous arguments by government counsel seeking to avoid the determination that a *Brady* violation had occurred in instances where the prosecutors' offices were unaware of suppressed *Brady* evidence *Brady* that was known to other persons involved in the prosecution's efforts.

For example, in *United States v. Antone,* 603 F.2d 566 (5th Cir.1979), the defendant was convicted in a federal prosecution which stemmed from joint, federal-state investigation. A state law enforcement agent paid the attorney fees of the government's chief witness, Haskew. The fee payment arrangement was not disclosed by the state agent to the federal agents or federal prosecutors on the case. Consequently, it was not disclosed to defense counsel. The government erroneously argued that the state agent's knowledge of the state's payments to the witnesses' attorney should not be attributed to the

federal government for *Giglio* purposes. The *Antone* court stated:

In the instant case, extensive cooperation between the investigative agencies convinces us that the knowledge of the state team that Haskew's lawyer was paid from state funds must be imputed to the federal team. We have little difficulty in concluding that the state investigators functioned as agents of the federal government under the principles of agency law utilized in *Giglio.* The state agents were in a real sense members of the prosecutorial team.

603 F.2d at 570.

The "prosecutorial team" concept does not, however, relieve the government of its duty to inquire about *Brady* information when the known facts warrant further inquiry into facts readily available. As the court stated in *United States v. Auten,* 632 F.2d 478 (5th Cir.1980):

If disclosure were excused in instances where the prosecution has not sought out information readily available to it, we would be inviting and placing a premium on conduct unworthy of representatives of the United States Government. This we decline to do.

The argument proffered by the government is not new. In *United States v. Deutsch,* 475 F.2d 55 (5th Cir.1973), the prosecution contended that it was not in possession of the information requested by the defendant. The information sought was in the files of the United States Postal Service. We noted that the prosecution was not denying that it had access, it merely denied present possession "without even an attempt to remedy the deficiency." *Id.* at 57. Finding no suggestion in *Brady* that different arms of the government are such separate entities as to be insulated one from the other, we remanded *Deutsch* for an examination of the information involved after concluding that the prosecutor was, for disclosure purposes, in possession of the subject information. *See United States v. Trevino,* 556 F.2d 1265 (5th Cir. 1977). Recently in *United States v. Antone,* 603 F.2d 566, 569 (5th Cir.1979), we cited *Deutsch* as authority for the declara-

tion that we decline "to draw a distinction between different agencies under the same government, focusing instead upon the 'prosecution team' which includes both investigative and prosecutorial personnel."

632 F.2d at 481 (footnote omitted).

It should never be the law that by maintaining ignorance, the U.S. Attorney's Office personnel can fulfill the government's due process obligation when the facts known not only warrant disclosure but should prompt further investigation.

The D.C. Circuit in *Brooks, supra*, expressed the following:

As has proved true of the other aspects of *Brady* jurisprudence, no formula defining the scope of the duty to search can be expected to yield easily predicted results. Where, as here, however, there is an explicit request for an apparently very easy examination, and a non-trivial prospect that the examination might yield material exculpatory information, we think the prosecution should make the inquiry. As the burden of the proposed examination rises, clearly the likelihood of a pay-off must also rise before the government can be put to the effort.

966 F.2d at 1504. In the case at bar, the government's burden of investigation was minimal. All that the prosecutors had to do was ask the MCC's Warden, the WITSEC marshals or the government's "non-El Rukn" witnesses who were housed at the MCC with the "El Rukn" witnesses.

The problem here was not the availability of sources for the *Brady* information. The problem was that the U.S. Attorney's Office personnel did not investigate, did not inquire, and did not request further drug testing. Personnel of the U.S. Attorney's Office had the power, authority and means to obtain much of the *Brady* information the government now disclaims. To draw artificial barriers, based on the government's self-willed prosecutorial ignorance, would, in this case, encourage "the ostrich" approach, would reward "conduct unworthy of the United States Attorney's Office," *Perdomo*, 929 F.2d at 970–71, and would deny the defendants the due process of law which *Brady* and its progeny were crafted to preserve.

(f) *The Government had an Obligation Under Brady to Disclose Facts Which Constituted the "Tip of the Iceberg"*

 Even if, contrary to this court's findings, government personnel did not know the extent of the "El Rukn" cooperating witnesses' illegal drug use and did not have a duty to inquire into indications of that illegal drug use, government counsel did have a duty to disclose those indications to the defense, so as to enable defense counsel to undertake the inquiry which the government deliberately avoided.

In *United States v. Shaffer*, 789 F.2d 682 (9th Cir.1986), the Ninth Circuit, affirming the trial court's grant of a new trial pursuant to *Brady*, reasoned that the duty of disclosure under *Brady* extended not only to the government's knowledge of concrete exculpatory information, but also to facts from which other exculpatory information could be inferred, *i.e.*, facts which could constitute the "tip of the iceberg" of other *Brady* evidence. 789 F.2d at 690–91.

In *Shaffer*, the facts which formed the "tip of the iceberg" were indications that the government, by not pursuing a civil forfeiture action against a government witness who had admittedly been involved in the drug trade, tacitly allowed him to keep the proceeds of his drug profiteering in return for his testimony. The Ninth Circuit stated:

The government contends that, because there was no explicit agreement on this matter, it had nothing to disclose. (Citations omitted.) Apparently the government misunderstands the district court's ruling. While it is clear that an explicit agreement would have to be disclosed because of its effect on Durand's credibility, it is equally clear that facts which imply an agreement would also bear on Durand's credibility and would have to be disclosed. (Citation omitted.) Indeed, as the Eleventh Circuit has observed: "If the arguably exculpatory statements of witnesses were in the prosecutor's file and not produced, failure to disclose indicates the "tip of an iceberg" of evidence that should have been revealed under *Brady*. *United*

States v. Griggs, 713 F.2d 672, 674 (11th Cir.1983).

This conclusion seems directly applicable to the facts in the instant appeal. The failure to disclose the extent of Durand's assets is exculpatory material that could indicate the "tip of an iceberg" of a secret deal of leniency.

789 F.2d at 690–91.

The principles expressed in *Shaffer* and the cases cited therein are also "directly applicable" to the facts of this case. Even if the government was somehow justified in ignoring the multiple indications of witness drug use which it admittedly knew, such as, *inter alia,* the 1989 positive drug tests or Harris' refusal to be tested, the defense was entitled to this information and to the right to pursue its own investigation. Further, as in *Shaffer,* the defendants in this case were entitled to know the undisclosed facts, such as the government's lenient security measures, the absence of drug testing and the other benefits, all of which pointed to an implicit and illicit deal between the government and its witnesses. The post-trial evidence revealed a sizable "iceberg" of *Brady* material. The defendants in the *Burnside* trial deserved the opportunity, which was denied them by the government, to discover the full extent of that "iceberg" before they went to trial.

2. *No Other Facts Excuse the Government's Non-Disclosure of the Brady–Giglio Material*

█ In a further attempt to have this court excuse its *Brady* and *Giglio* failures, the government has argued that the defense counsel in the *Burnside* trial could have subpoenaed the information which government counsel had not disclosed. The government has also argued its *Brady* and *Giglio* violations should be excused because the 1991 MCC memorandum showing the positive 1989 drug tests (Defendants' Exhibit Mildner Memorandum) was put in evidence at the *Andrews* trial before Judge Conlon and was therefore part of the "public record." Again, the government's arguments lack merit.

In presenting arguments which blame defense counsel for their failure to obtain the *Brady* materials, the government ignores the pretrial representations it made regarding the government's promised compliance with *Brady* and *Giglio,* which were signed by AUSA Hogan and are quoted at pp. 1222–1223, *supra.* These representations stated that the *Giglio* material would be provided to the defense "at a time sufficient to allow the defendant(s) to make adequate use of such evidence." (Government's Consolidated Response to Defendants' Motions for Discovery, filed June 29, 1990.)

The government's arguments on these points also disregard the facts that the prosecution did more than merely fail to disclose the information or comply with its pretrial representations. Government counsel took affirmative steps to prevent defense counsel from learning of the *Brady* and *Giglio* material by deliberately frustrating "El Rukn" defendants' lawyers' attempts to obtain the material through subpoenas. Further, the government, most specifically AUSA Hogan, deliberately distorted the public record so as to conceal the true facts relating to the *Brady* material.

(a) *Government Counsel Resisted and Did Not Comply with Defense Trial Subpoenas*

The government's argument in its post-trial Brief in Opposition at page 5 that "Defendants Could Have Obtained Evans' and Harris' Drug Tests Results with a Subpoena" is spurious in light of the post-trial facts. No trial subpoena served by any defense counsel in any of the "El Rukn" trials which preceded the *Burnside* trial was ever properly complied with. In every instance, the government resisted production and failed to properly furnish the subpoenaed information.

At the outset of the *Boyd* trial before Judge Aspen, defense counsel served a subpoena for information as to "any chemical analysis" of the government witnesses, as well as their movements to and from the MCC. AUSA Hogan strenuously resisted compliance with those subpoenas stating to Judge Aspen: "We strongly oppose that, your Honor ..." (Aspen Trial, May 6, 1991, Tr. 2–3). AUSA Hogan knew that Harris and Evans had tested positive for unautho-

rized drugs and that they had thereafter continued their drug use. At no time during the *Boyd* trial did AUSA Hogan or any other government personnel disclose the existence or nature of the subpoenaed information regarding the "chemical analysis" of the government witnesses, which would have shown, had it been produced, Harris' and Evans' illegal drug use.

When the defendants' counsel in the *Andrews* trial before Judge Conlon served subpoenas in August 1991 calling for drug testing information as to the "El Rukn" inmate witnesses, AUSA Hogan again resisted compliance, arguing to Judge Conlon that:

> all those records are protected by the Freedom of Information Act, which the defendants have not complied with the requirements, and many of them are privileged.

(C.Tr. 5535–36.)

On August 15, 1991 before Judge Conlon, the government possessed even more information which should have been disclosed under *Brady* and *Giglio* than had been known on May 6, 1991 before Judge Aspen. For example, Harris' drug test refusal of May 30, 1991 and Harris' admission that he had drunk a heroin-spiked soft drink handed him by Evans were known to U.S. Attorney's Office paralegals, if not the AUSA's. Yet the information was still not disclosed. Moreover, even though ordered by Judge Conlon, the government failed to comply fully with the subpoenas in the *Andrews* trial. Consequently, significant information which was required to be disclosed under *Brady* and *Giglio* was not disclosed in any of the trials before Judge Aspen, before Judge Conlon, or before this court.

It was the government's affirmative obligation to comply with the requirements of the *Brady* and *Giglio* decisions as well as with its own pretrial representations in this case that it would disclose the *Brady* and *Giglio* material it possessed. It was also the government's obligation to properly comply with the trial subpoenas served upon it. The government did none of these things as to the facts regarding the illegal drug use by its "El Rukn" inmate witnesses and did none of these things regarding the undisclosed bene-

fits received by its "El Rukn" inmate witnesses.

In *Freeman v. State of Georgia*, 599 F.2d 65, 71–72 (5th Cir.1979), the Fifth Circuit, reversing the district court's denial of a writ of habeas corpus, refused to excuse the State's *Brady* violation on the grounds that the defendant had failed at trial to subpoena a material witness. The facts involved a policeman who, for personal reasons, had helped conceal an exculpatory witness from the defense. The court stated:

> When a police statement misleads the defense into believing that evidence will not be favorable, the state cannot thereafter argue that it was a waiver not to request it. A defendant cannot have waived more than what he knew existed. Freeman was not required to subpoena a witness whose report to the police contained nothing favorable to his case. Moreover, we cannot overlook the fact that even if he had tried to locate Darlene, it would have been futile because of her concealment.

*599 F.2d at 72.*

■ The precept underlying the ruling in *Freeman* applies in this case. AUSA Hogan sought to ensure that the defense would never seek out the *Brady* information by taking actions to mislead the defendants into thinking that no *Brady* information existed. The government should not be allowed to profit from its efforts to prevent defendants from obtaining *Brady* information. *See also United States v. Shaffer*, 789 F.2d 682, 690 (9th Cir.1986) (prosecution misleading defense as to favorable nature of information nullifies disclosure under *Brady*); *accord Hughes v. Hopper*, 629 F.2d 1036, 1039 (5th Cir.1980).

The government, in seeking to have its suppression of the *Brady* and *Giglio* material excused, refers this court to a 1991 case from the Fifth Circuit and claims:

> *United States v. Ellender*, 947 F.2d 748 (5th Cir.1991), is almost squarely on point. There, the court held that the prosecution's failure to disclose prison records of the defendant did not violate *Brady* because the defendant could have subpoenaed the records himself. *Id.* at 757.

(Government's Brief in Opposition filed March 22, 1993, p. 5.)

Contrary to the government's argument, the *Ellender* case is not on point. The *Ellender* court explicitly noted:

4. We need not reach the question of whether Ellender's prison record might be deemed to be exculpatory and express no opinion on the matter.

947 F.2d at 757 n. 4. Moreover, it was defendant Ellender's own prison record that defendant Ellender claimed the government refused to provide him, not government witnesses' positive drug test results or benefits received from the government by the government's witnesses.

Defendant Ellender in the *Ellender* case was obviously well aware of the existence of his own prison record. The defendants in the *Burnside* trial were, however, not aware, informed or apprised of any MCC records showing the unauthorized use of drugs by Evans or Harris. Nor were defense counsel informed of any of the undisclosed benefits bestowed by the government on its cooperating "El Rukn" inmate witnesses until after the *Burnside* trial had concluded. Furthermore, defense counsel did not know of the information because the government had taken steps to ensure that defense counsel would not know. The *Ellender* court based its holding on the principle that "where the defendant's own lack of reasonable diligence is the *sole* reason for not obtaining the pertinent material, there can be no *Brady* claim." 947 F.2d at 757 (citation omitted) (emphasis added). In this case, government suppression and obfuscation, not lack of diligence by defense counsel, is the reason defendants did not have the *Brady* and *Giglio* material the government had suppressed.

Also, in *Ellender,* a letter detailing the psychiatric treatment of a government witness, Doug Tull, who testified against a co-defendant of Ellender's, Swope, was not turned over to the defense at the trial. The court stated:

The government contends that any failure to disclose this letter did not prejudice Swope because he could still discredit Tull through cross-examination. This letter qualifies as impeachment material and

therefore *Brady* required the government to disclose it to Swope.

947 F.2d at 757.

The Fifth Circuit in *Ellender* went on to note that the government's failure to disclose the psychiatrist's letter did not necessitate a new trial because the letter was not material, and because the defendant "knew of Tull's psychiatric treatment and could have raised this issue on cross-examination." *Id.*

As in *Ellender,* the undisclosed information as to the drug use by and benefits bestowed upon certain of the government's "El Rukn" inmate witnesses was impeaching information the government was required to disclose. Unlike the *Ellender* case, however, neither the defendants in the *Burnside* trial nor this court were aware or apprised of the impeaching information which had been suppressed by government counsel. Moreover, in contrast to the *Ellender* case, the government here took affirmative steps to prevent the defendants from obtaining the materials. Defense counsels' not specifically seeking that material by subpoena, therefore, does not excuse the government's concealment and misrepresentations.

(b) *The Brady Material Was Not Available From the "Public Record"*

■ Initially, it should be noted that each of the defendants' counsel in the *Burnside* trial were court-appointed and reimbursed for their time and expenses under the *Criminal Justice Act* ("CJA") program in the district court. Defense counsel in the *Burnside* trial did not monitor *all* the preceding "El Rukn" trials and were not expected to do so. The efficient use of Criminal Justice Act funds to pay and reimburse defense counsel is a very practical reason why our system of justice should require the government's counsel to provide the *Brady* and *Giglio* information to defense counsel rather than have defense counsel use their time and the sparse CJA funds to try to gather information favorable to the defense which is already in the government counsel's possession.

■ Moreover, contrary to the government's arguments, although the Defense Exhibit Mildner Memorandum was put into evi-

dence in the *Andrews* case before Judge Conlon, it was not available to defense counsel in the *Burnside* trial for the following reasons.

First, AUSA Hogan intentionally did not provide the 1991 "Mildner Memorandum" nor the part of the *Andrews* trial transcript dealing with the "Mildner Memorandum" to the *Burnside* defense counsel (H. 16; 143)[52] as he was required to do under his pretrial representations quoted at pp. 8–9 and under the *Brady* and *Giglio* doctrine. Because of the non-disclosure, defense counsel properly inferred that no *Brady* or *Giglio* material existed.

Secondly, the government had obtained a highly restrictive pretrial protective order in Case No. 89 CR 908, which inhibited communications among defense counsel of the various "El Rukn" trials. That pretrial protective order had to be lifted post-trial to let the respective defense counsel in the *Burnside* trial in Case No. 89 CR 909 obtain information from defense counsel in the *Andrews* trial in Case No. 89 CR 908. Before that post-trial modification,[53] the exchange of information by defense counsel of the different "El Rukn" cases was restricted at the government's insistence.

Third, pursuant to the Local Rules of the Northern District of Illinois, each counsel, not the district court's clerk, is to maintain exhibits introduced at trial. (General Local Rule 33 of the Northern District of Illinois.)[54] The defense exhibit, designated post-trial as "Defendants' Exhibit Mildner Memorandum," though admitted in evidence by Judge Conlon in the *Andrews* trial, was not publicly available as part of the public record which could be obtained from the court's clerk.

**52.** The government continued to suppress this and certain other *Brady* information thereafter in subsequent trials (H. 129–30). Some information, however, was revealed in the trial before Judge Tinder (H. 130–32) which commenced in April 1992 (H. 31–32).

**53.** In November 1992, Judge Conlon modified the protective order which had been previously entered in the *Andrews* case at the government's request. That November 1992 order entered by Judge Conlon states in part:

Furthermore, AUSA Hogan was able to distort the facts in the public record about the "Mildner Memorandum" by continuing to conceal further significant *Brady* and *Giglio* material. The scant information which was provided to defense counsel in the *Andrews* trial in response to the defense's trial subpoena was so minimal as to be ineffectual. This allowed AUSA Hogan to conceal and misrepresent the true facts to Judge Conlon, and to the jury in his closing argument in the *Andrews* case, thereby obfuscating the facts which would have been disclosed to defense counsel in the *Burnside* trial had they examined the *Andrews* trial transcript and received a copy of the "Mildner Memorandum" exhibit.

Although the fact that Harris and Evans both had tested positive for morphine in 1989 (Defendants' Exhibit Mildner Memorandum) was revealed on August 15, 1991 in response to a defense subpoena in Judge Conlon's case, all the other impeaching facts which the government knew about Harris' and Evans' illegal drug use were not revealed. Government trial counsel AUSA Hogan succeeded in continuing to suppress additional facts which should have been disclosed under *Brady*. These facts included the following:

> (1) the fact that no prescribed medication producing a positive drug test for morphine was authorized either for Harris during the detectible time period before his May 11, 1989 positive test or for Evans during the detectible time period before his April 12, 1989 positive test (C. 252);
>
> (2) the fact that Harris and Evans had been suspected drug users by government personnel in 1989 and thereafter;

Protective Order in this case is modified to allow defense counsel in this case to discuss the discovery material in this case with the defense counsel in *United States v. Burnside*, 89 CR 909.

**54.** General Local Rule 33 (N.D.Ill.) states in part as follows:

(a) Exhibits shall be retained by the attorney producing them unless the court orders them deposited with the clerk.

(3) the fact that personnel in the U.S. Attorney's Office, including Hogan, had known of Harris' and Evans' positive drug test results since at least October 1989;

(4) the fact that prison disciplinary hearings had, in fact, occurred as to Harris and Evans, respectively, for drug related (H. 1476; 1481–88) and non-drug related acts (H. 2191);

(5) the fact that government "El Rukn" witness, Jackie Clay, an MCC inmate with Harris and Evans, had repeatedly told Hogan about Harris' and Evans' continuing drug use;

(6) the fact that Harry Martin told Hogan of the illegal drug use;

(7) the fact that Harris had refused to submit to a drug test at the MCC on May 30, 1991 less than a week before he testified at the first "El Rukn" trial;

(8) the fact that a disciplinary hearing into Harris' May 30, 1991 drug test refusal had occurred on June 27, 1991 in a jury room in the Dirksen Building;

(9) the fact that Hogan in late June 1991 had telephoned Hafer and complained about the timing and location of that June 27, 1991 disciplinary hearing of Harris (H. 4830); and

(10) the fact that at the time of the *Burnside* trial Harris and Evans had not been tested for the ingestion of illegal drugs at the MCC in almost two years.

**55.** That is not what Hafer testified. (C.Tr. 5758–5783.) Moreover, there, in fact, had been a disciplinary hearing on June 27, 1989 at which Harris confessed to ingesting the illegal drugs. (Defendants' Exhibit Harris Incident Report 6/5/89). Also, as Hogan well knew, there had been a disciplinary hearing as to Harris in a jury room in the Dirksen Building on June 27, 1991. (Defendants' Exhibit Harris Incident Report 5/30/91.)

**56.** Hogan had interceded on behalf of the "El Rukn" witnesses numerous times and had, indeed, "called up the MCC" just six weeks before, regarding Harris' June 27, 1991 disciplinary hearing, and told MCC Executive Assistant Hafer:

Had these ten impeaching facts, which AUSA Hogan successfully continued to suppress despite the introduction of the "Mildner Memorandum," been revealed at the *Andrews* trial, AUSA Hogan could have never been able to distort the public record to make it appear that Harris' and Evans' positive drug tests resulted from authorized medication. Had these impeaching facts, which AUSA Hogan deliberately continued to suppress, been revealed at the *Burnside* trial, then further areas could have been explored and exposed by defense counsel on cross-examination of the government witnesses. Moreover, further witnesses could perhaps have been called to testify by the defense. Hogan's suppression of the undisclosed facts and his distortion in the public record of the true facts, however, stymied the defense inquiry and the possibility of presentation of further defense evidence.

In his closing argument in the *Andrews* trial before Judge Conlon, AUSA Hogan told the jury that:

[Defense counsel] talk about the fact Henry Harris tested positive for morphine while he was at the MCC in witness protection.

You heard Bob Hafer get on here and he told you that there never was a disciplinary hearing.[55] [Defense counsel] wants you to believe that was by some sort of intercession of the federal government; that perhaps I or Mr. Poulos called up the MCC [56] and said, "Oh, you got Henry Harris' dirty with a urine sample over there? Don't test him; [57] don't discipline him." [58]

He [Hogan] was very upset that I [Hafer] had the DHO [Disciplinary Hearing Officer] over here [to the Dirksen Building] to conduct that hearing [of Harris]. (H. 1382.)

**57.** When Hogan made this closing argument in August 1991, Evans and Harris had not been tested by the MCC for illegal drugs in over twenty-two months. (Defendants' Exhibit MCC Urine Surveillance Log.)

**58.** Hogan knew Harris had been disciplined because he, Hogan, had spoken to Hafer complaining about one of the disciplinary proceedings regarding Harris less than two months before. Hogan also knew that the MCC had not produced the files reflecting those disciplinary pro-

There is not a shred of evidence in this case,[59] ladies and gentlemen, that we have anything to do with the independent disciplinary procedures of the MCC.

(C.Tr. 6170.)

Had all the true facts been revealed, AUSA Hogan could have never made those factually false arguments. Had the government not concealed the *Brady* information it had, the public record would have differed substantially and would have undoubtedly attracted the attention of the defense counsel in the *Burnside* trial. The government should not now be allowed to take advantage of its distortions of the public record.

The reasoning of the Ninth Circuit in *United States v. Shaffer*, 789 F.2d 682, 690 (9th Cir.1986) supports this conclusion. One aspect of the *Brady* material at issue in *Shaffer* was tape recorded information that could have been used to impeach a government witness' testimony. The government argued that it had not violated *Brady* because it had told the defense of the existence of the tapes. Rejecting this argument, the Ninth Circuit stated:

> Second, the district court was correct in holding that, while the government did apprise Shaffer's counsel of tapes that detailed Durand's involvement, such disclosure was inadequate because the government also told Shaffer's counsel that these tapes would be of no value to Shaffer's defense. This later statement negates any disclosure made in the earlier statement.

789 F.2d at 690.

The principle animating the Ninth Circuit's ruling in *Shaffer* is that governmental actions which mislead defendants about the nature of *Brady* material estop the government from later claiming that the defense lacked diligence in obtaining those materials.

Government counsel here took many actions which distorted the public record and deceived the defendants about the nature of the *Brady* information that the government possessed and suppressed. The government, not the defense, therefore bears the responsibility for the fact that the *Brady* information did not emerge until after the *Burnside* trial.

### B. The Suppressed Evidence was Favorable to the Defense

The *Giglio* and *Bagley* decisions established and reaffirmed that evidence which impeaches the government's witnesses is favorable evidence which must be disclosed to the defense under the *Brady* doctrine. The evidence suppressed in the *Burnside* trial was highly impeaching of the government's witnesses and therefore meets the second element of a *Brady* constitutional violation. (Government's Memorandum of Law, filed May 11, 1992, pp. 3–4.)

### 1. The Illegal Drug Use was Relevant to the Witnesses' Abilities to Recollect and Relate

 Before the court held the post-trial evidentiary hearings, but after the drug test results became known to defense counsel in the *Burnside* trial, government counsel argued:

> Only drug use showing that the witness was under the influence of narcotics while observing the acts that are the subject of his testimony, or showing that the witness was under the influence of narcotics while testifying, has any probative potential. *See e.g., United States v. Sampol,* 636 F.2d 621, 666–67 (D.C.Cir.1980). And even if long term drug use may impact on a witness' ability to recollect, one or two instances does not advance that inquiry. Therefore, even if true, isolated drug use while at the MCC, well after the events about which the witnesses testified but over two years prior to their testimony, was irrelevant.

(Government's Memorandum of Law filed May 11, 1992, pp. 3–4.)

---

ceedings regarding Harris in response to the subpoena in the *Andrews* trials.

**59.** Of course, there was "not a shred of evidence." As Hogan knew, he personally had suppressed the true facts by his deliberate failure to

abide by the government's pretrial discovery promises, quoted at pp. 1222–1223, *supra,* to produce *Giglio* material, the non-compliance with the trial subpoenas served in the *Andrews* trial before Judge Conlon, and by other violations of the *Brady* doctrine.

Contrary to the government counsel's erroneous pre-hearing representations as to the facts, this was not a case of "one or two instances" of drug use. Nor is it a situation of "isolated drug use while at the MCC, well after the events about which the witnesses testified, but over two years prior to their testimony". (Government's Memorandum of Law filed May 11, 1992, p. 4.) As discussed in the court's findings of fact, this is a case of substantial and continuing illegal drug usage over a period of years by certain of the government's cooperating "El Rukn" inmate witnesses.

The government in its post-trial hearing Brief in Opposition continues to display the "ostrich" approach and ignores the facts which show the magnitude and continuing nature of Harris' and Evans' acquisition, possession and usage of illegal drugs while incarcerated at the MCC. The government, erroneously arguing that it is only the evidence of Evans' and Harris' 1989 drug use which is at issue, contends:

> Evidence that Evans and Harris may have used drugs at the MCC in 1989 would not properly have been admissible at trial. Drug use is not probative of truthfulness and is off-limits for purposes of cross-examination under Rule 608(b). Moreover, the introduction of evidence of drug use to suggest that people who have used drugs are more likely to tell lies is precisely the type of character attack that the case law forbids. Thus, any evidence that Evans and Harris used drugs at the MCC in 1989 could not have been litigated at trial and consequently could not have changed the outcome of the proceeding. Accordingly, the witnesses' potential drug use was not material under *Brady*.

(Government's Brief in Opposition filed March 22, 1993, p. 10.)

The post-trial evidence established that drug use by Harris, Evans and other cooperating "El Rukn" inmate witnesses, such as Earl Hawkins, though proven to be known by government personnel in the U.S. Attorney's Office, such as AUSA Hogan, paralegals Luchetta and Van Blake, and, at a minimum, suspected by others, such as AUSA's Hartmann and Poulos, remained unchecked throughout the entire period of the various "El Rukn" trials. Drug use of the magnitude that occurred in connection with the "El Rukn" inmate witnesses is sufficient to permit the defense to inquire as to whether the witnesses' continued ingestion of illegal drugs affected their ability to recollect and relate. *See United States v. Robinson*, 956 F.2d 1388, 1397 (7th Cir.1992).

2. *Government Benefits Facilitating Drug Use were Relevant to the Witnesses' Credibility*

■ The government's brief also ignores the fact that, not only did its witnesses use illegal drugs, but the government tacitly allowed its witnesses to engage in the very type of criminal conduct which law enforcement officials are supposed to investigate and prosecute, not overlook and assist. The government witnesses were allowed not only to continue their illegal drug use unhindered, but were provided with governmental assistance which enabled them to do so. The concealed and undisclosed benefits bestowed by the government aided the witnesses in their acquisition and use of illegal drugs, among other ways, as follows: (a) the free and seemingly unlimited telephone service on government telephone lines could have been and were used to discuss drug deliveries to the witnesses; (b) the lax government scrutiny and inspection of the witnesses and their visitors aided the transfer of the drugs so the drugs could be and were taken by the witnesses back to the MCC undetected; and (c) the numerous contact visits with friends and family (some of whom had been or were in the illegal drug business with the witnesses) in the U.S. Attorney's Office's rooms under little or no government surveillance made the delivery of drugs to the government's witnesses easy to carry out.

To persons like Harry Evans and Henry Harris, who had previously used illegal drugs and who desired to continue their use of illegal drugs while in custody, these benefits were clear inducements from which a fact finder could infer that these witnesses may have wanted to stay on the government prosecutors' good side and adjusted their testimony accordingly. This is the very type of bias

which an effective cross-examination is designed to reveal for the fact finder's consideration. The government's suppression denied the defendants in the *Burnside* trial that opportunity.

The facts further imply the existence of a silent agreement between the government and its "El Rukn" inmate witnesses: lenience as to the illegal drug use in exchange for testimony helpful to the government. Whether or not such an agreement existed, the defense counsel were entitled to the facts which would have enabled them to assert that such an agreement was reached even though implicit. *See United States v. Shaffer*, 789 F.2d 682, 690–91 (9th Cir.1986). The government's suppression deprived the defense of this argument.

Had defense counsel in the *Burnside* trial been aware of the evidence which has now surfaced as a result of the post-trial hearings, there is no doubt that a sufficient predicate could have been laid to allow effective cross-examination of the government's "El Rukn" inmate witnesses as to the full scope of their post-plea, post-cooperation, continued illegal drug use.

3. *Defendants were Deprived of Their Constitutional Confrontation Right by Failure to Disclose Drug Use*

█ The government's non-disclosure of the highly impeaching illegal drug use and non-disclosure of the substantial benefits received by the government's witnesses violated each defendant's rights under the Confrontation Clause of the Sixth Amendment to the Constitution. As the Supreme Court stated in *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986):

> We think that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness." *Davis v. Alaska, supra,* 415 U.S. [308] at 318, 94 S.Ct. [1105] at 1111 [39 L.Ed.2d 347] (1974).

The cross-examination which could have been conducted had the *Brady* and *Giglio* material been disclosed would have been directed at showing the "prototypical form of bias" about which the Supreme Court was speaking in *Van Arsdall* and *Davis*. For example, in *United States v. Simmons*, 964 F.2d 763 (8th Cir.1992), a government cooperating witness, Grenda Pierce, who was on probation, failed a drug test shortly before she testified at the trial. The prosecution was not aware of the test or the failure. The evidence was not disclosed to defense counsel. The court stated:

> Without the evidence that she [Grenda Pierce] recently failed a drug test given by her probation officer, however, "the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness." *Davis*, 415 U.S. at 318, 94 S.Ct. at 1111. Although we do not speculate as to whether the jury would have found the prohibited line of inquiry persuasive, "defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of facts and credibility, could appropriately draw inferences relating to the reliability of the witness." *Id.* Appellants have thus met the burden of showing a violation of the confrontation clause: the cross-examination permitted by the district court prevented them from engaging in otherwise appropriate cross-examination into a "prototypical form of bias," Pierce's status as a probation violator. *Van Arsdall*, 475 U.S. at 680, 106 S.Ct. at 1435–36.

*Id.* at 770. The court in *Simmons*, however, after finding there had been a Sixth Amendment violation determined the error to be harmless pursuant to *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) under the facts of the case. The *Simmons* court also stated:

> We also note that no *Brady* violation occurred because the results of the drug test were not shown to be available to the prosecution until after trial. *See Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97.

*Id.* at 769 n. 11.

Here, the evidence clearly establishes the prosecution not only knew the results of the

drug tests before trial, but deliberately suppressed that *Brady* evidence. Moreover, that suppressed *Brady* evidence was not merely of one failed drug test, but of continuing criminal conduct of illegal acquisition, possession and use of drugs over a prolonged period known to the prosecutor, within the prosecutor's office and aided by the government's permissiveness.

AUSA Hogan, knowing he had successfully suppressed in the *Burnside* trial all evidence of the continuing illegal drug use and benefits, vigorously argued during the government's closing and rebuttal arguments in the *Burnside* trial that Henry Harris, Harry Evans, Earl Hawkins and Ervin Lee had confessed all their crimes, were "absolutely forthright", "truthful" and "credible." Hogan stressed, among other things, in arguing Harris', Evans', Hawkins' and Lee's credibility, their ability to recall events. He told the jury:

> Harry Evans' and Earl Hawkins' and Henry Harris' and Ervin Lee's testimony about these specific events is exceedingly accurate. They were all right down the line on when the events occurred, within a month or so, two, and they were right down the line on who was present for them, and they didn't have any difficulty remembering anything about what it was that they did or who they did it with.

(H.Tr., p. 39, October 23, 1991.)

> Harry Evans and Earl Hawkins stood there—or sat there on that witness stand, and told you everything they did, their memory is good.

(H.Tr., p. 39, October 23, 1991.)

> They're telling the truth about what they did, and they remember it all. They're telling the truth about what they did...."

(H.Tr., pp. 39–40, October 23, 1991.)

> They were absolutely forthright, and they told you everything that they had done, and confessed to you.

(H.Tr., pp. 246–47, October 24, 1991.)

> If they are telling the truth about all the bad stuff they did, they are telling the truth about these defendants, too.

(H.Tr., p. 249, October 24, 1991.)

> One of the defense lawyers argued about the instruction that you are given that says

to consider these witnesses' testimony with great care and caution. Do it, because when you do, you're going to determine that their testimony was credible and truthful, absolutely truthful and credible, in conjunction with everything.

(H.Tr., p. 251, October 24, 1991.)

As AUSA Hogan well knew, however, the government's witnesses had not "confessed" or told the jury "about all the bad stuff they did." The witnesses had not disclosed, because the government had not disclosed, "all the bad stuff" about the continuing acquisition, possession and use of illegal drugs by the government's "El Rukn" witnesses while incarcerated at the MCC.

Hogan knew also those witnesses had not told the jury about all of the benefits bestowed upon them by the government because again the government had not disclosed those benefits to defense counsel. Hogan, to enhance the chance of obtaining defendants' convictions, had deliberately suppressed that information because it was highly impeaching of the government's witnesses and clearly favorable to the defense.

### C. *The Suppressed Evidence was Material*

As stated earlier, the Supreme Court has determined that suppressed evidence is material:

> only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985); *quoting Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984).

The Supreme Court has also stated:

> Of course, the right to cross-examine includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable.

*Pennsylvania v. Ritchie,* 480 U.S. 39, 51–52, 107 S.Ct. 989, 998, 94 L.Ed.2d 40 (1987).

### 1. *The Suppressed Evidence was Admissible as to the Government Witnesses' Bias*

 The government's arguments that the suppressed information is not material because it would not have been admissible at the *Burnside* trial are without merit. The facts relating to the government's "El Rukn" inmate witnesses acquisition, possession and use of illegal drugs, as well as their receipt of benefits which at a minimum consisted of the government providing its "El Rukn" inmate witnesses with money, clothing, radios, cameras, gifts, cigarettes, free telephone services, beer, sexually explicit conversation, and contact visits as well as conjugal visits, were all permissible areas of cross-examination on the issue of each government witness' bias.

Without the defense counsel in the *Burnside* trial knowing about those facts, defense counsel had no basis to conduct cross-examination as to those areas of bias. *See Oostendorp v. Khanna,* 937 F.2d 1177 (7th Cir. 1991). Had defense counsel known of the facts and had the court not allowed cross-examination on those facts, it probably would have been reversible error. For example, in *United States v. Ray,* 731 F.2d 1361, 1365 (9th Cir.1984), the court held:

> The district court's refusal to permit cross-examination of [the government's witness] on his alleged post-plea drug activities deprived the jury of important information on [the government's witness] possible bias. It thereby committed an abuse of discretion. We reverse [defendant's] conviction and remand for a new trial.

The government argues that Rule 608(b) of the Federal Rules of Evidence would preclude extrinsic evidence of the drug use and benefits if denied by the government's witnesses on cross-examination. This argument is erroneous. As the court stated in *United States v. Atherton,* 936 F.2d 728, 733 (2d Cir.1991):

> It is true that when evidence of a witness' prior misconduct is properly offered to show bias, that evidence "is not limited by the strictures of Rule 608(b)." *United*

*States v. Schwab,* 886 F.2d 509, 511 (2d Cir.1989).

Based on the facts presented here, a jury could easily infer bias in favor of the government from the fact that the witnesses were permitted by the government to engage in criminal conduct, such as illegal drug acquisition, possession, and use within the confines of purportedly secure government areas. *See United States v. Schwab,* 886 F.2d 509 (2d Cir.1989); *see also United States v. Costa,* 947 F.2d 919 (11th Cir.1991); *United States v. Calle,* 822 F.2d 1016 (11th Cir.1987).

The suppressed *Brady* evidence would have allowed defense counsel to show that the government's witnesses had strong and substantial reasons to testify in the way government counsel desired. That suppressed *Brady* evidence, if exposed, would have shown government personnel were not only aware of the illegal drug use, but had closed their eyes to the government witnesses' conduct and took no action to enforce the law against them.

The suppression by the government of the extensive, highly impeaching evidence regarding the government's witnesses' credibility contributed to the verdict the government obtained. *See Ouimette v. Moran,* 942 F.2d 1, 12 (1st Cir.1991).

### 2. *The Credibility of the Government Witnesses was Essential to Government's Obtaining Defendants' Convictions*

Henry Harris, Harry Evans, Earl Hawkins and Ervin Lee were the four primary government witnesses in the *Burnside* trial. Without the jury believing these witnesses, especially Harris and to a lesser degree Evans, Hawkins and Lee, the government could not have proven the defendants guilty beyond a reasonable doubt on any of the charges of which they were convicted.

Harris' testimony about the details of the alleged drug transactions with each of the three defendants in the *Burnside* trial formed the basis of the proof upon which they were each convicted. Were the jury not to have believed Harris, the government's

case would have been left with a gaping hole of reasonable doubt.

There was no other significant evidence against defendant Burnside but the testimony of Harris and to a lesser extent the testimony of Evans and Hawkins. All three of these witnesses, unbeknownst to defense counsel, had used illegal drugs while cooperating with the government. As to defendant Griffin, it was also the jury's assessment of the credibility of the drug users, Harris, Evans, and Hawkins, which was the key to the conviction. The fact that Hogan suppressed undisclosed evidence precluded a substantial attack on these witnesses' credibility and their ability to recall the facts to which the witnesses testified, as well as their bias in favor of the government.

As to defendant Jackson, Harris again was the key government witness, with Hawkins and Lee also providing a part of the government's evidence. Had the undisclosed illegal drug use and undisclosed benefits been revealed to defendants' counsel, the ensuing cross-examination would have had a substantial and damaging impact on Harris', Evans', Hawkins' and Lee's credibility, in addition to attacking their recollections and their bias.

The government in its Brief in Opposition argues that the undisclosed evidence of illegal drug use and government benefits was not material because Harris' and Evans' testimony was corroborated as to "the participation of the three defendants in the crimes of which they were convicted." (Government's Brief in Opposition filed March 22, 1993, p. 13.) A substantial amount of the government's purported corroboration, however, is tainted by the same infirmities that taint the testimony of Harris, Evans, Hawkins, and Lee's—the undisclosed illegal drug use and the undisclosed benefits.

The tape recordings of the phone conversations which were spoken in "El Rukn" code were translated by Harris. Those translations depended upon Harris' credibility to be considered corroboration of the criminal conduct in which the defendants allegedly engaged. Harris' credibility could have been destroyed if the undisclosed impeaching information been available.

Indeed, the post-trial facts have led even the government to concede that it cannot now say that Harris told the truth as to all matters in his prior testimony. (H. 38.) Without Harris' testimony being believed by the jury as to what the conversations were between himself and each of the defendants on particular occasions when no other witness was present, the government could not have presented proof beyond a reasonable doubt.

The testimony of witnesses Permenter, McDowell, Sweeney and Special Agent Moore, which the government contends corroborate Harris, Evans, Hawkins, and Lee (Government's Brief in Opposition filed March 22, 1993, pp. 13–14), provided little proof of the charged crimes other than merely to place people in certain locations. It is the testimony, should it be believed, of Harris, Evans, Hawkins and Lee, the cooperating "El Rukn" witnesses who testified at the *Burnside* trial, upon which the government's case as to each defendant on each count depended. Had the credibility of the government's witnesses been destroyed, the government's case would have been destroyed.

Moreover, the government's arguments that the testimony of cooperating "El Rukn" inmate witness Ervin Lee corroborates Harris as to the defendants Jackson and Griffin (Government's Brief in Opposition filed March 22, 1993, p. 14) ignore the fact that Lee also received undisclosed benefits from government personnel which could have been effectively used to substantially undermine Lee's credibility in the eyes of the jury to the point that the jury may not have believed him. AUSA Hogan's suppression of that evidence, however, precluded this prototypical attack on the government's witnesses' credibility at the *Burnside* trial.

3. *The Suppressed Evidence was not Cumulative as to the Government Witnesses' Credibility*

■ The government points to the cross-examinations which were conducted by defense counsel, without defense counsel having any knowledge of the suppressed facts, and argues that "The Drug Test Results, Even If Admitted, Would Have been Merely Cumula-

tive Impeachment." (Government's Brief in Opposition to Defendants' Motion for a New Trial filed March 22, 1993, p. 12.) The government's argument is without merit. The positive drug tests and other substantial evidence of the continuing drug use by Harris, Evans, Hawkins and others, as well as the evidence of undisclosed benefits the witnesses received, would have "provided the defense with more than merely insignificant supplemental support for cross-examination purposes." *See e.g., Jacobs v. Singletary,* 952 F.2d 1282, 1289 (11th Cir.1992).

Having listened to the testimony of the witnesses and reviewed the exhibits at the trial, the court does not doubt that, with the suppressed *Brady* evidence in their hands, defense counsel could have shown, contrary to AUSA Hogan's closing argument, that Harris, Evans, Hawkins and Lee,

> [were not] telling the truth about all the bad stuff they did [and were not] telling the truth about these defendants, too.

(H.Tr., p. 249, October 24, 1991).

By failing to disclose the favorable *Brady* evidence, the government deprived the defense of the full use of the primary legal tool for revealing the truth: cross-examination. Defense counsels' cross-examination as to the government's witnesses' past acts of wrongdoing, through appropriate areas of inquiry, would have had substantially more impact in the *Burnside* trial had the witnesses' continuing post-cooperation, post-plea criminal conduct been exposed as well.

As demonstrated by AUSA Hogan's closing argument, the contention that the government's witnesses had ceased their criminal conduct and had been candid about their past criminal acts constituted a key part of the government's position on the credibility of the government's witnesses. The argument that the witnesses had, at least to some extent, reformed themselves and ended their criminal behavior by cooperating with the government was important to the government's case, as it is in any case where the government presents witnesses with criminal histories. The use by the defense of the suppressed *Brady* information would have enabled each defendant to devastate this aspect of the government's arguments. Therefore, information relating to the post-plea, post-cooperation criminal activity would have enabled a much more effective cross-examination than did knowledge of the witnesses' pre-plea, pre-cooperation crimes alone.

Defense counsel could have shown that the "El Rukn" inmate witnesses were not worthy of belief. Had the suppressed *Brady* information been fully provided to defense counsel, exposure of the highly impeaching facts and the resulting effective confrontation and display of substantial witnesses' bias would have severely undermined the government's case against each of the three defendants in the *Burnside* trial. Had the evidence of the government witnesses' post-cooperation, post-plea, illegal drug use been brought to the jury's attention, the witnesses' "entire testimony may have been rejected by the jury." *United States v. Wallach,* 935 F.2d 445, 457 (2d Cir.1991).

### 4. *Government Counsel's Admissions and Conduct Points Toward a Finding of Materiality*

AUSA Hogan, during his testimony near the outset of the post-trial hearings, denied that the undisclosed 1989 drug testing information was material to the determination of whether the indictment should have been returned, but admitted as to the undisclosed drug test results:

> It could have impacted on our ability to return the indictment at all. If somebody had said to me that the MCC has made a determination that two of your major witnesses have been using drugs or have used drugs, I would question whether or not those persons were reliable, whether I could return such a huge indictment that was crafted in large part around their testimony, or their expected testimony.

(H. 151.)

Moreover, as the post-hearing evidence revealed, when ATF supervisory personnel questioned AUSA Hogan about all the benefits which were being provided to the government's witnesses in the "El Rukn" cases:

> Hogan was insistent that without the good will of the El Rukn witnesses the government had no case.

(Statement of ATF Special Agent/Supervisor Arthur D. Aherns; Government's Filing of January 20, 1993.)

Based upon the magnitude of the undisclosed *Brady* material and the facts proving AUSA Hogan's knowledge of the undisclosed *Brady* material, the only conclusion that can be drawn is that Hogan suppressed the *Brady* information in bad faith to improve, unconstitutionally, the government's chances of victory. In *United States v. Jackson,* 780 F.2d 1305, 1311 n. 4 (7th Cir.1986) the Seventh Circuit noted:

The fact that the government seeks in bad faith to suppress certain evidence indicates that such evidence may indeed be material. We are doubtful that any prosecutor would in bad faith act to suppress evidence unless he or she believed it could affect the outcome of the trial. In short, the existence of bad faith is merely a factor a court may consider in making its materiality determination.

The post-trial evidence clearly established that AUSA Hogan knew a significant amount of *Brady* and *Giglio* material when he signed the "Government's Consolidated Response to Defendants' Motion for Discovery" in June of 1990. His pretrial representations, which are quoted earlier in this opinion at pp. 1222–1223, turned out to be misrepresentations designed to deceive the court and defense counsel into believing that compliance with *Brady* and *Giglio* would be forthcoming if the government knew of such information. When a government counsel conceals facts and makes such misrepresentations, due process is thwarted. Because government counsel's prosecutorial obligations transcend that of an ordinary adversary, a court and defense counsel are entitled to rely on government counsel to act and make representations consistent with that obligation. Misrepresentations and concealment by U.S. Attorney personnel are contrary to those prosecutorial obligations.

The concealment of *Brady* information continued beyond the trial, into the post-trial hearings and even after the post-trial hearings concluded. Significant *Brady* material known to the government before, during and after the post-trial hearings was not disclosed in a timely fashion. U.S. Attorney Foreman's nearly year-long delay in disclosing paralegal Luchetta's misconduct and the two-year delay in disclosing the "EL RUKIN GUARD DUTY REPORT" are merely two examples of several instances of the government's concealments of *Brady* material which should have been disclosed. These concealments were inconsistent with the government's due process disclosure obligations. These examples and others point to the government's bad faith, and demonstrate how due process is hindered when prosecutors fail to fulfill their obligations. Considering all the post-trial evidence, including the post-hearing evidence, the court is compelled to conclude that

there is a reasonable probability had the evidence been disclosed to the defense, the result of the [*Burnside* trial] would have been different

*United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). The third element—the materiality element—of a constitutional *Brady* violation has been shown.

D. *Knowing Use of Perjured Testimony*

Harris and Evans specifically denied any post-arrest illegal drug use when they testified at the post-trial hearings. It appears based on all the evidence that Harris and Evans were not truthful in those denials. The credible evidence of Harris' and Evans' continued illegal drug use is just too substantial to come to any other conclusion.

Looking at the precise questions asked and the answers given by Harris and Evans at the *Burnside* trial, however, this court cannot conclude, based on those specific questions and answers, that Harris and Evans committed perjury at that trial. Consequently, unlike the situation in *United States v. Wallach,* 935 F.2d 445 (2d Cir.1991), cited by defense counsel, the court cannot conclude that a new trial should be awarded on the basis of the prosecution's knowing use of perjured testimony. *See generally United States v. Thomas,* 987 F.2d 1298, 1299–1301 (7th Cir.1993).

Based on the post-trial evidence, the government's suppression of material evidence

favorable to the defense in violation of the *Brady* doctrine warrants fashioning a remedy to rectify the constitutional deprivations which occurred.

### E. *The Proper Remedy*

In a recent opinion, *United States v. Bernal–Obeso*, 989 F.2d 331 (9th Cir.1993), Judge Stephen Trott, a former U.S. Department of Justice official now a Ninth Circuit judge, observed:

> A prosecutor who does not appreciate the perils of using rewarded criminals as witnesses risks compromising the truth-seeking mission of our criminal justice system. Because the government decides whether and when to use such witnesses, and what, if anything to give them for their service, the government stands uniquely positioned to guard against perfidy. By its actions, the government can either contribute to or eliminate the problem. Accordingly, we expect prosecutors and investigators to take all reasonable measures to safeguard the system against treachery. This responsibility includes the duty as required by *Giglio* to turn over to the defense in discovery *all* material information casting a shadow on a government witness's credibility.

989 F.2d at 333–34 (citations omitted).

In *Bernal–Obeso*, the Ninth Circuit vacated the defendant's conviction and remanded the case for a hearing into whether government counsel was aware of a key government witness's felony record which was not disclosed by the government to the defendant's counsel. The court, citing *United States v. Ray*, 731 F.2d 1361, 1364 (9th Cir.1984), stated that a new trial should be ordered if the defense "allegations of misconduct have some grounding in reality." 989 F.2d at 337. The court in *Bernal–Obeso* went on to state that:

> Should the court uncover egregious wrongdoing by the government, however, nothing in this opinion forecloses consideration by the court of dismissing the indictment for outrageous government conduct. *See United States v. Restrepo*, 930 F.2d 705,

712 (9th Cir.1991), *United States v. Barrera–Moreno*, 951 F.2d 1089 (9th Cir.1991).

*Id.* (footnote omitted).

Although the acts of prosecutorial misconduct shown to have occurred in the case at bar are more numerous and egregious than those in *Bernal–Obeso*, the crimes allegedly committed by the defendants in the "El Rukn" cases are more serious as well. To determine the proper remedy here, balancing these factors is necessary.

 The prosecutorial misconduct in which government counsel engaged to obtain the convictions in the *Burnside* trial deprived the defendants of their constitutional rights to due process of law. Therefore, the court is compelled to grant a new trial, which is the proper remedy based on the facts now known.

An investigation conducted by the Office of Professional Responsibility of the Department of Justice, *see* 28 C.F.R. § 0.39 *et seq.* (1992) has commenced into the facts shown by the post-trial evidence. That investigation is continuing. Additional evidence may be presented to the court by counsel at the conclusion of that investigation.

The prosecutorial misconduct revealed by the post-trial evidence is disturbing. It certainly does not reflect the manner in which the vast majority of the employees of the U.S. Attorney's Office in Chicago perform their duties. In that office, many excellent prosecutors and staff members carry out their responsibilities with the highest degree of professional integrity.

### CONCLUSION

For the reasons stated herein, the Motions for New Trial filed by defendants Burnside, Griffin and Jackson are GRANTED. ·